75 N.Y.2d 530 (1990)
In the Matter of Ronald Levandusky, Respondent,
v.
One Fifth Avenue Apartment Corp., Appellant.
Court of Appeals of the State of New York.
Argued February 14, 1990.
Decided April 5, 1990.
Joel David Sharrow and Arthur F. Abelman for appellant.
Irwin Brownstein for respondent.
Chief Judge WACHTLER and Judges SIMONS, ALEXANDER, HANCOCK, JR., and BELLACOSA concur with Judge KAYE; Judge TITONE concurs in a separate opinion.
*533 KAYE, J.
This appeal by a residential cooperative corporation concerning apartment renovations by one of its proprietary lessees, factually centers on a two-inch steam riser and three air conditioners, but fundamentally presents the legal question of what standard of review should apply when a board of directors of a cooperative corporation seeks to enforce a matter of building policy against a tenant-shareholder. We conclude that the business judgment rule furnishes the correct standard of review.
In the main, the parties agree that the operative events transpired as follows. In 1987, respondent (Ronald Levandusky) decided to enlarge the kitchen area of his apartment at One Fifth Avenue in New York City. According to Levandusky, some time after reaching that decision, and while he was president of the cooperative's board of directors, he told Elliot Glass, the architect retained by the corporation, that he intended to realign or "jog" a steam riser in the kitchen area, and Glass orally approved the alteration. According to Glass, however, the conversation was a general one; Levandusky never specifically told him that he intended to move any particular pipe, and Glass never gave him approval to do so. In any event, Levandusky's proprietary lease provided that no "alteration of or addition to the water, gas or steam risers or pipes" could be made without appellant's prior written consent.
Levandusky had his architect prepare plans for the renovation, which were approved by Glass and submitted for approval to the board of directors. Although the plans show details of a number of other proposed structural modifications, *534 including changes in plumbing risers, no change in the steam riser is shown or discussed anywhere in the plans.
The board approved Levandusky's plans at a meeting held March 14, 1988, and the next day he executed an "Alteration Agreement" with appellant, which incorporated "Renovation Guidelines" that had originally been drafted, in large part, by Levandusky himself. These guidelines, like the proprietary lease, specified that advance written approval was required for any renovation affecting the building's heating system. Board consideration of the plans  appropriately detailed to indicate all structural changes  was to follow their submission to the corporation's architect, and the board reserved the power to disapprove any plans, even those that had received the architect's approval.
In late spring 1988, the building's managing agent learned from Levandusky that he intended to move the steam riser in his apartment, and so informed the board. Both Levandusky and the board contacted John Flynn, an engineer who had served as consulting agent for the board. In a letter and in a subsequent presentation at a June 13 board meeting, Flynn opined that relocating steam risers was technically feasible and, if carefully done, would not necessarily cause any problem. However, he also advised that any change in an established old piping system risked causing difficulties ("gremlins"). In Flynn's view, such alterations were to be avoided whenever possible.
At the June 13 meeting, which Levandusky attended, the board enacted a resolution to "reaffirm the policy  no relocation of risers." At a June 23 meeting, the board voted to deny Levandusky a variance to move his riser, and to modify its previous approval of his renovation plans, conditioning approval upon an acceptable redesign of the kitchen area.
Levandusky nonetheless hired a contractor, who severed and jogged the kitchen steam riser. In August 1988, when the board learned of this, it issued a "stop work" order, pursuant to the "Renovation Guidelines." Levandusky then commenced this article 78 proceeding, seeking to have the stop work order set aside. The corporation cross-petitioned for an order compelling Levandusky to return the riser to its original position. The board also sought an order compelling him to remove certain air-conditioning units he had installed, which allegedly were not in conformity with the requirements of the Landmarks Preservation Commission.
*535 Supreme Court initially granted Levandusky's petition, and annulled the stop work order, on the ground that there was no evidence that the jogged pipe had caused any damage, but on the contrary, the building engineer had inspected it and believed it would likely not have any adverse effect. Therefore, balancing the hardship to Levandusky in redoing the already completed renovations against the harm to the building, the court determined that the board's decision to stop the renovations was arbitrary and capricious, and should be annulled. Both counterclaims were dismissed, the court ruling that the corporation had no standing to complain of violations of the Landmarks Preservation Law, particularly as the building had not been cited for any violation.
On reargument, however, Supreme Court withdrew its decision, dismissed Levandusky's petition, and ordered him to restore the riser to its original position and submit redrawn plans to the board, on the ground that the court was precluded by the business judgment rule from reviewing the board's determination. The court adhered to its original ruling with respect to the branch of the cross motion concerning the air conditioners, notwithstanding that the Landmarks Preservation Commission had in the interim cited them as violations.
On Levandusky's appeal, the Appellate Division modified the judgment. The court was unanimous in affirming the Supreme Court's disposition of the air conditioner claim, but divided concerning the stop work order. A majority of the court agreed with Supreme Court's original decision, while two Justices dissented on the ground that the board's action was within the scope of its business judgment and hence not subject to judicial review. Concluding that the business judgment rule applies to the decisions of cooperative governing associations enforcing building policy, and that the action taken by the board in this case falls within the purview of the rule, we now modify the order of the Appellate Division.
At the outset, we agree with the Appellate Division that the corporation's cross claim concerning Levandusky's three air-conditioning units was properly dismissed, as the appropriate forum for resolution of the complaint at this stage is an administrative review proceeding. That brings us to the issue that divided the Appellate Division: the standard to be applied in judicial review of this challenge to a decision of the board of directors of a residential cooperative corporation.
*536 As cooperative and condominium home ownership has grown increasingly popular, courts confronting disputes between tenant-owners and governing boards have fashioned a variety of rules for adjudicating such claims (see generally, Goldberg, Community Association Use Restrictions: Applying the Business Judgment Doctrine, 64 Chi-Kent L Rev 653 [1988] [hereinafter Goldberg, Community Association Use Restrictions]; Note, Judicial Review of Condominium Rulemaking, 94 Harv L Rev 647 [1981]). In the process, several salient characteristics of the governing board homeowner relationship have been identified as relevant to the judicial inquiry.
As courts and commentators have noted, the cooperative or condominium association is a quasi-government  "a little democratic sub society of necessity" (Hidden Harbour Estates v Norman, 309 So 2d 180, 182 [Fla Dist Ct App]). The proprietary lessees or condominium owners consent to be governed, in certain respects, by the decisions of a board. Like a municipal government, such governing boards are responsible for running the day-to-day affairs of the cooperative and to that end, often have broad powers in areas that range from financial decisionmaking to promulgating regulations regarding pets and parking spaces (see generally, Note, Promulgation and Enforcement of House Rules, 48 St John's L Rev 1132 [1974]). Authority to approve or disapprove structural alterations, as in this case, is commonly given to the governing board. (See, Siegler, Apartment Alterations, NYLJ, May 4, 1988, at 1, col 1.)
Through the exercise of this authority, to which would-be apartment owners must generally acquiesce, a governing board may significantly restrict the bundle of rights a property owner normally enjoys. Moreover, as with any authority to govern, the broad powers of a cooperative board hold potential for abuse through arbitrary and malicious decision-making, favoritism, discrimination and the like.
On the other hand, agreement to submit to the decisionmaking authority of a cooperative board is voluntary in a sense that submission to government authority is not; there is always the freedom not to purchase the apartment. The stability offered by community control, through a board, has its own economic and social benefits, and purchase of a cooperative apartment represents a voluntary choice to cede certain of the privileges of single ownership to a governing body, often made up of fellow tenants who volunteer their *537 time, without compensation. The board, in return, takes on the burden of managing the property for the benefit of the proprietary lessees. As one court observed: "Every man may justly consider his home his castle and himself as the king thereof; nonetheless his sovereign fiat to use his property as he pleases must yield, at least in degree, where ownership is in common or cooperation with others. The benefits of condominium living and ownership demand no less." (Sterling Vil. Condominium v Breitenbach, 251 So 2d 685, 688, n 6 [Fla Dist Ct App].)
It is apparent, then, that a standard for judicial review of the actions of a cooperative or condominium governing board must be sensitive to a variety of concerns  sometimes competing concerns. Even when the governing board acts within the scope of its authority, some check on its potential powers to regulate residents' conduct, life-style and property rights is necessary to protect individual residents from abusive exercise, notwithstanding that the residents have, to an extent, consented to be regulated and even selected their representatives (see, Note, The Rule of Law in Residential Associations, 99 Harv L Rev 472 [1985]). At the same time, the chosen standard of review should not undermine the purposes for which the residential community and its governing structure were formed: protection of the interest of the entire community of residents in an environment managed by the board for the common benefit.
We conclude that these goals are best served by a standard of review that is analogous to the business judgment rule applied by courts to determine challenges to decisions made by corporate directors (see, Auerbach v Bennett, 47 N.Y.2d 619, 629). A number of courts in this and other states have applied such a standard in reviewing the decisions of cooperative and condominium boards (see, e.g., Kirsch v Holiday Summer Homes, 143 AD2d 811; Schoninger v Yardarm Beach Homeowners' Assn., 134 AD2d 1; Van Camp v Sherman, 132 AD2d 453; Papalexiou v Tower W. Condominium, 167 NJ Super 516, 401 A2d 280; Schwarzmann v Association of Apt. Owners, 33 Wash App 397, 655 P2d 1177; Rywalt v Writer Corp., 34 Colo App 334, 526 P2d 316). We agree with those courts that such a test best balances the individual and collective interests at stake.
Developed in the context of commercial enterprises, the business judgment rule prohibits judicial inquiry into actions *538 of corporate directors "taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." (Auerbach v Bennett, 47 N.Y.2d 619, 629, supra.) So long as the corporation's directors have not breached their fiduciary obligation to the corporation, "the exercise of [their powers] for the common and general interests of the corporation may not be questioned, although the results show that what they did was unwise or inexpedient." (Pollitz v Wabash R. R. Co., 207 N.Y. 113, 124.)
Application of a similar doctrine is appropriate because a cooperative corporation is  in fact and function  a corporation, acting through the management of its board of directors, and subject to the Business Corporation Law. There is no cause to create a special new category in law for corporate actions by coop boards.
We emphasize that reference to the business judgment rule is for the purpose of analogy only. Clearly, in light of the doctrine's origins in the quite different world of commerce, the fiduciary principles identified in the existing case law  primarily emphasizing avoidance of self-dealing and financial self-aggrandizement  will of necessity be adapted over time in order to apply to directors of not-for-profit homeowners' cooperative corporations (see, Goldberg, Community Association Use Restrictions, op. cit., at 677-683). For present purposes, we need not, nor should we determine the entire range of the fiduciary obligations of a cooperative board, other than to note that the board owes its duty of loyalty to the cooperative  that is, it must act for the benefit of the residents collectively. So long as the board acts for the purposes of the cooperative, within the scope of its authority and in good faith, courts will not substitute their judgment for the board's. Stated somewhat differently, unless a resident challenging the board's action is able to demonstrate a breach of this duty, judicial review is not available.
In reaching this conclusion, we reject the test seemingly applied by the Appellate Division majority and explicitly applied by Supreme Court in its initial decision. That inquiry was directed at the reasonableness of the board's decision; having itself found that relocation of the riser posed no "dangerous aspect" to the building, the Appellate Division concluded that the renovation should remain. Like the business judgment rule, this reasonableness standard  originating in the quite different world of governmental agency decision-making *539  has found favor with courts reviewing board decisions (see, e.g., Amoruso v Board of Managers, 38 AD2d 845; Lenox Manor v Gianni, 120 Misc 2d 202; see, Note, Judicial Review of Condominium Rulemaking, op. cit., at 659-661 [discussing cases from other jurisdictions]).
As applied in condominium and cooperative cases, review of a board's decision under a reasonableness standard has much in common with the rule we adopt today. A primary focus of the inquiry is whether board action is in furtherance of a legitimate purpose of the cooperative or condominium, in which case it will generally be upheld. The difference between the reasonableness test and the rule we adopt is twofold. First  unlike the business judgment rule, which places on the owner seeking review the burden to demonstrate a breach of the board's fiduciary duty  reasonableness review requires the board to demonstrate that its decision was reasonable. Second, although in practice a certain amount of deference appears to be accorded to board decisions, reasonableness review permits  indeed, in theory requires  the court itself to evaluate the merits or wisdom of the board's decision (see, e.g., Hidden Harbour Estates v Basso, 393 So 2d 637, 640 [Fla Dist Ct App]), just as the Appellate Division did in the present case.
The more limited judicial review embodied in the business judgment rule is preferable. In the context of the decisions of a for-profit corporation, "courts are ill equipped and infrequently called on to evaluate what are and must be essentially business judgments * * * by definition the responsibility for business judgments must rest with the corporate directors; their individual capabilities and experience peculiarly qualify them for the discharge of that responsibility." (Auerbach v Bennett, 47 NY2d, supra, at 630-631.) Even if decisions of a cooperative board do not generally involve expertise beyond the usual ken of the judiciary, at the least board members will possess experience of the peculiar needs of their building and its residents not shared by the court.
Several related concerns persuade us that such a rule should apply here. As this case exemplifies, board decisions concerning what residents may or may not do with their living space may be highly charged and emotional. A cooperative or condominium is by nature a myriad of often competing views regarding personal living space, and decisions taken to benefit the collective interest may be unpalatable to one resident or another, creating the prospect that board decisions *540 will be subjected to undue court involvement and judicial second-guessing. Allowing an owner who is simply dissatisfied with particular board action a second opportunity to reopen the matter completely before a court, which  generally without knowing the property  may or may not agree with the reasonableness of the board's determination, threatens the stability of the common living arrangement.
Moreover, the prospect that each board decision may be subjected to full judicial review hampers the effectiveness of the board's managing authority. The business judgment rule protects the board's business decisions and managerial authority from indiscriminate attack. At the same time, it permits review of improper decisions, as when the challenger demonstrates that the board's action has no legitimate relationship to the welfare of the cooperative, deliberately singles out individuals for harmful treatment, is taken without notice or consideration of the relevant facts, or is beyond the scope of the board's authority.
Levandusky failed to meet this burden, and Supreme Court properly dismissed his petition. His argument that having once granted its approval, the board was powerless to rescind its decision after he had spent considerable sums on the renovations is without merit. There is no dispute that Levandusky failed to comply with the provisions of the "Alteration Agreement" or "Renovation Guidelines" designed to give the board explicit written notice before it approved a change in the building's heating system. Once made aware of Levandusky's intent, the board promptly consulted its engineer, and notified Levandusky that it would not depart from a policy of refusing to permit the movement of pipes. That he then went ahead and moved the pipe hardly allows him to claim reliance on the board's initial approval of his plans. Indeed, recognition of such an argument would frustrate any systematic effort to enforce uniform policies.
Levandusky's additional allegations that the board's decision was motivated by the personal animosity of another board member toward him, and that the board had in fact permitted other residents to jog their steam risers, are wholly conclusory. The board submitted evidence  unrefuted by Levandusky  that it was acting pursuant to the advice of its engineer, and that it had not previously approved such jogging. Finally, the fact that allowing Levandusky an exception to the policy might not have resulted in harm to the building *541 does not require that the exception be allowed. Under the rule we articulate today, we decline to review the merits of the board's determination that it was preferable to adhere to a uniform policy regarding the building's piping system.
Turning to the concurrence, it is apparent that in many respects we are in agreement concerning the appropriate standard of judicial review of cooperative board decisions; it is more a matter of label that divides us. For these additional reasons, we believe our choice is the better one.
For the guidance of the courts and all other interested parties, obviously a single standard for judicial review of the propriety of board action is desirable, irrespective of the happenstance of the form of the lawsuit challenging that action.[*] Unlike challenges to administrative agency decisions, which take the form of article 78 proceedings, challenges to the propriety of corporate board action have been lodged as derivative suits, injunction actions, and all manner of civil suits, including article 78 proceedings. While the nomenclature will vary with the form of suit, we see no purpose in allowing the form of the action to dictate the substance of the standard by which the legitimacy of corporate action is to be measured.
By the same token, unnecessary confusion is generated by prescribing different standards for different categories of issues that come before cooperative boards  for example, a standard of business judgment for choices between competing economic options, but rationality for the administration of corporate bylaws and rules governing shareholder-tenant rights (see, concurring opn, at 545). There is no need for two rules when one will do, particularly since corporate action often partakes of each category of issues. Indeed, even the decision here might be portrayed as the administration of corporate bylaws and rules governing shareholder-tenant rights, or more broadly as a policy choice based on the *542 economic consequences of tampering with the building's piping system.
Finally, we reiterate that "business judgment" appears to strike the best balance. It establishes that board action undertaken in furtherance of a legitimate corporate purpose will generally not be pronounced "arbitrary and capricious or an abuse of discretion" (CPLR 7803 [3]) in article 78 proceedings, or otherwise unlawful in other types of litigation. It is preferable to a standard that requires Judges, rather than directors, to decide what action is "reasonable" for the cooperative. It avoids drawing sometimes elusive semantical distinctions between what is "reasonable" and what is "rational" (the concurrence rejects the former but embraces the latter as the appropriate test). And it better protects tenant-shareholders against bad faith and self-dealing than a test that insulates board decisions "if there is a rational basis to explain them" or if "an articulable and rational basis for the board's decision exists." (Concurring opn, at 548.) The mere presence of an engineer's report, for example  "certainly a rational explanation for the board's decision" (concurring opn, at 548)  should not end all inquiry, foreclosing review of nonconclusory assertions of malevolent conduct; under the business judgment test, it would not.
Accordingly, the order of the Appellate Division should be modified, with costs to appellant, by reinstating Supreme Court's judgment to the extent it granted appellant's cross motions regarding the steam riser and severed and set down for assessment the issue of damages and, as so modified, affirmed.
TITONE, J. (concurring).
I concur in the majority's decision to modify, and I agree with much of its reasoning. Indeed, like the majority, I conclude that in fashioning standards for review of decisions made by cooperative apartment boards we should be guided by the need to afford these boards the greatest possible degree of deference, since excessive judicial interference would unquestionably undermine their effectiveness. My disagreement with the majority thus lies not in its rejection of a test of "reasonableness" that would embroil the courts in second-guessing the wisdom of every cooperative board decision, but rather in its choice to formulate the proper standard in terms of the "business judgment rule." That standard, which is most often applied to review of management's business decisions and use of corporate assets, is ill-suited *543 to the entirely different task of reviewing management's implementation of the bylaws and rules governing shareholders' rights and duties. Accordingly, I write separately to express my own views as to the proper standard for judicial review in these cases.
My own analysis begins with the fact that the shareholder's challenge to the cooperative board's action in this case was made through the procedural vehicle of a CPLR article 78 proceeding. That procedural choice was not a mere "happenstance" or accident of nomenclature (majority opn, at 541). Petitioner was not making a claim of waste or self-dealing by corporate management of the type that would ordinarily be cognizable in a derivative action brought pursuant to Business Corporation Law § 626. Rather, petitioner was alleging misfeasance in the administration of the bylaws and rules governing shareholders' rights to use and enjoy their apartments.
In the past, similar claims involving the administration of shareholders' rights and duties vis-à-vis the other shareholders, the corporation's management and the corporation as a discrete legal entity have been treated as matters cognizable under article 78 (see, e.g., Matter of Crane Co. v Anaconda Co., 39 N.Y.2d 14; Matter of Auer v Dressel, 306 N.Y. 427; see also, 5A Fletcher, Cyclopedia Corporations § 2214 [Perm ed 1987]). As one commentator has noted, "[m]andamus to review the discretional acts of a private corporation is commonplace since the corporation is a creature of the state" (McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, C7802:1, at 276 [and cases cited therein]; cf., Matter of Carr v St. John's Univ., 12 N.Y.2d 802 [decisions of educational corporations also subject to review for arbitrariness under article 78]). The justification for article 78 review in these circumstances is, quite simply, that the authority of corporations and their directors to act is derived directly from franchises issued by the State (McLaughlin, Practice Commentaries, op. cit., at 276). Since the decision of which petitioner complains was a discretionary act affecting shareholders' rights and was made by a board of directors acting pursuant to the bylaws and rules of a franchised corporation, article 78 review was plainly the proper remedy.
Given that conclusion, our choice of an appropriate standard for judicial review must be guided by CPLR 7803, which describes with particularity "[t]he only questions that may be raised in a[n article 78] proceeding". It is well established that *544 the four "questions" set forth in CPLR 7803 (1)-(4) are the exclusive measures of the judiciary's power of review in matters cognizable under article 78 (see, e.g., Matter of Pell v Board of Educ., 34 N.Y.2d 222). It is equally well established that the standard for reviewing discretionary decisions of "bodies or officers" is whether the challenged decision was "made in violation of lawful procedure" or was "arbitrary and capricious or an abuse of discretion" (CPLR 7803 [3]). It is that test which should be our starting point here.
The "arbitrary and capricious" standard of CPLR 7803 (3), used judiciously, would be more than adequate to accomplish the primary goals identified by the majority, i.e., providing some check on the potential for abusive exercise of the power of cooperative apartment boards, while, at the same time, minimizing the type of judicial interference that could impair the ability of these boards to govern effectively (cf., Matter of Olsson v Board of Higher Educ., 49 N.Y.2d 408, 413-414; Matter of Fiacco v Santee, 72 AD2d 652; Matter of Edde v Columbia Univ., 8 Misc 2d 795, affd 6 AD2d 780, cert denied 359 US 956 [all noting judicial reluctance to interfere with academic decisionmaking and applying minimal "arbitrary and capricious" scrutiny to such decisions]). Indeed, the cornerstone of article 78 review under the "arbitrary and capricious" test is that "a court may not substitute its judgment for that of the board or body it reviews unless the decision under review is arbitrary and unreasonable" (Matter of Diocese of Rochester v Planning Bd., 1 N.Y.2d 508, 520).
Given the suitability of the statutory "arbitrary and capricious" standard, I cannot concur in the majority's decision to reach out and embrace the "business judgment rule", a standard that was developed to address an entirely different class of problems. The "business judgment" rule to which the majority refers is most relevant, and has most often been applied in the past, to shareholder derivative actions brought to challenge the propriety of management's business decisions including such diverse matters as investment choices, the making of contractual commitments, long-range corporate planning and the decision as to whether it is in the corporate interest to pursue an action against a director for waste (see, e.g., Auerbach v Bennett, 47 N.Y.2d 619; Kalmanash v Smith, 291 N.Y. 142; Pollitz v Wabash R. R. Co., 207 N.Y. 113). In fact, the classic formulation of the rule is closely tailored to the open-ended decisionmaking within a virtually limitless universe of economic options that typifies business choices: "Questions *545 of policy of management, expediency of contracts or action, adequacy of consideration, lawful appropriation of corporate funds to advance corporate interests, are left solely to [the directors'] honest and unselfish decision, for their powers therein are without limitation and free from restraint" (Pollitz v Wabash R. R. Co., supra, at 124, quoted in Auerbach v Bennett, supra, at 629). Concomitantly, review under the "business judgment" rule is limited to determining whether the challenged action is "taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes", because "courts are ill equipped * * * to evaluate what are and must be essentially business judgments * * * [as to which] there can be no available objective standard" for measuring their correctness (Auerbach v Bennett, supra, at 629, 630; see, Fe Bland v Two Trees Mgt. Co., 66 N.Y.2d 556, 565).
This test may have some utility by analogy in a limited class of cases involving cooperative apartment boards. In Schoninger v Yardarm Beach Homeowners' Assn. (134 AD2d 1), for example, the court used the business judgment rule to rebuff a shareholder's challenge to a decision by a cooperative board to pursue a particular program of repair and rehabilitation in preference to the program suggested by the shareholder and her experts. Application of the rule to this problem was appropriate because the challenged action was, in essence, a business judgment, i.e., a choice between competing and equally valid economic options, albeit one not necessarily motivated by the desire to make a profit.
The justification for applying the business judgment rule to cooperative apartment board decisions falls short, however, in cases such as this one, which involves the administration of the corporate bylaws and rules governing shareholder-tenant rights (cf., Schoninger v Yardarm Beach Homeowners' Assn., supra, at 8-9 [distinguishing between the two categories of decisionmaking and recognizing that different standards of review should be applied]). First, in contrast to cases involving sheer business choices, our courts' extensive experience in reviewing licensing, zoning and other discretionary administrative matters renders them well suited, rather than "ill equipped," to deal with questions such as the rationality or arbitrariness of a board decision to grant or deny a shareholder's application for permission to renovate. Second, this test provides an objective standard and thereby minimizes the risk *546 of excessive judicial intervention and entanglement in what, as the majority notes, are often highly emotional disputes.
In contrast, the standard of review mandated by the traditional business judgment rule focuses principally on the honesty and integrity of the decisionmaker, and the presence or absence of self-dealing or fraud in the decisionmaking process (see, e.g., Auerbach v Bennett, supra, at 629-630; Pollitz v Wabash R. R. Co., supra). However, questions of pure venality or dishonesty on the part of board members rarely enter into disputes about the use of residential cooperative apartment units. The more common sources of disputes in this area are the alleged arbitrariness of a particular board decision or, as here, the alleged existence of a vendetta or other personally malicious motive (see, e.g., Matter of Boisson v 4 E. Hous. Corp., 129 AD2d 523).
By its own admission, the majority's adoption of the "business judgment" rule for these intramural controversies is motivated largely by its own view that the courts ought to mediate in the latter class of cases. It is this choice that most clearly differentiates my position from the majority's and renders our disagreement more than a simple "matter of label" (majority opn, at 541). Unlike the majority, I believe that a rule which authorizes judicial inquiry into the personal motives and potentially vindictive aims underlying otherwise rational decisions is fundamentally unsound  for precisely the same reasons that have led the majority to reject the "reasonableness" test that the Appellate Division apparently used.
As the majority notes, these disputes over the use of the shareholder's own living space often pit neighbor against neighbor under circumstances that are likely to generate bitterness and distrust. Further, the very nature of cooperative apartment living, which throws relative strangers together, requires them to reside in close proximity and forces them to cede a degree of personal freedom to the collective good, provides a fertile breeding ground for festering resentments and long-standing feuds. Thus, claims of "bad faith," in the sense of personally directed animus, will be relatively easy to make in these cooperative board disputes  and will be equally easy to support with factual allegations dredging up the details of the parties' old grievances. The likely consequence will be more claims capable of surviving a motion to *547 dismiss (see, e.g., Matter of Boisson v 4 E. Hous. Corp., supra)[1] and more judicial interference with management decisionmaking than the "reasonableness" standard the majority rejects would produce.
Moreover, a standard that would authorize our courts to explore the board members' ulterior personal motives is, in my view, both impractical and undesirable as a matter of judicial policy. It is impractical because many, if not most, of the challenged decisions will involve a mixture of malevolent and legitimate motives. Exposing, separating and then measuring the role that the various motives played in the decisionmaking process is a daunting, and probably unrealistic, inquiry. Further, the undesirability of focusing on the parties' subjective motives is plain, since such a focus will encourage the combatants to bring all of their dirty laundry into the courtroom and will place the court in the distasteful role of arbiter of a myriad of petty accusations and grievances.[2]
Because of these serious pitfalls, I would simply apply the "arbitrary and capricious" standard of article 78 to these cases and hold that discretionary decisions of the cooperative board regarding individual shareholder-tenants' rights are not *548 actionable if there is a rational basis to explain them. Contrary to the majority's suggestion (majority opn, at 541-542), there is nothing undesirable, or even particularly unusual, about applying differing standards of judicial review to cases involving different types of issues. Indeed, CPLR 7803 mandates the use of different standards for disputes between citizens and the State, depending upon the category of issue to be considered (CPLR 7803). Similarly, there is no sound reason to insist upon a single standard for judicial review for cases presenting diverse legal problems simply because they arise within the setting of cooperative apartment corporations. Again, this is not a matter of mere "happenstance" or "labeling," but rather of claims which present fundamentally different problems requiring the use of different analytical tools. Disputes in which shareholder-tenants seek to vindicate their group interests as against the board of directors are analogous to Business Corporation Law § 626 derivative actions and lend themselves readily to the "business judgment" standard of review. In contrast, disputes which pit an individual shareholder-tenant against the other shareholder-tenants, acting either as a group or through their elected board, are more amenable to analysis under the CPLR 7803 (3) "arbitrary and capricious" standard. The distinction is not difficult to apply and is no more confusing than the well-understood distinction between representative shareholder actions for waste and mismanagement and those brought by individual shareholders to vindicate their personal rights.
Finally, despite the majority's assertions to the contrary, the arbitrary and capricious standard, when properly applied, does not entail an inquiry into the "reasonableness" or the wisdom of the challenged decision. To the contrary, as in the case of article 78 review of discretionary administrative determinations, the judicial role in these cases is limited to ascertaining that an articulable and rational basis for the board's decision exists.
Here, for example, the board's stated concern  and its ostensible basis for refusing petitioner's request for permission to tinker with a steam riser  was the risk of creating unforeseen problems elsewhere in the building's old, well-worn pipe system. This concern, which was articulated by the building's engineer, was certainly a rational explanation for the board's decision and was therefore sufficient to remove that decision from the category of "arbitrary and capricious" determinations *549 that are cognizable under article 78. This conclusion should, and would, end the inquiry under the test I propose.
In sum, the business judgment rule, with its attendant focus on the honesty of the decisionmaker, is a poor fit in the context of discretionary administrative decisions such as this one. Further, I can see no reason to stretch the contours of that rule's standard of review for these cases, because a more apt test lies readily at hand, i.e., the standard set forth in CPLR 7803 (3). Since application of that test leads me to the same ultimate conclusion as the majority has reached by its somewhat more circuitous route, I concur, but only in the result.
Order modified, with costs to appellant, in accordance with the opinion herein and, as so modified, affirmed.
NOTES
[*] We of course do not disregard the form of action. In determining whether appellant's decision was "arbitrary and capricious or an abuse of discretion" (CPLR 7803 [3]), we would use "business judgment," the concurrence some form of "rationality" or "reasonableness." By analogy, we hold today in Akpan v Koch (75 N.Y.2d 561, 574 ([decided today]) that because a governmental agency took the required "hard look" under the State's environmental protection laws, its action cannot be characterized as arbitrary and capricious or an abuse of discretion under CPLR 7803 (3). So too here, board action that comes within the business judgment rule cannot be characterized as arbitrary and capricious, or an abuse of discretion.
[1] The majority's decision to reject petitioner's claims without an evidentiary hearing is difficult to reconcile with its expressed unwillingness to foreclose review of allegations of "malevolent conduct" (majority opn, at 542). Petitioner's papers contained factual allegations that one of the board members "has for several years been * * * causing problems for any other cooperator who needs something from the Board" and that this board member "is causing problems for [petitioner] because [he] said publicly that she had violated her proprietary lease by hooking up a sink in the rooftop greenhouse of her apartment." Petitioner further claimed that the full board knew about this violation but was "afraid to do anything because of the threat of becoming victim of [the board member's] vendettas." Although the majority describes petitioner's claims on this point as "wholly conclusory" (majority opn, at 540), these allegations seem to me to be sufficiently specific to survive a motion to dismiss under a test that looks beyond the objective rationality of the decision and mandates an inquiry into the subjective motivations of the decisionmaker. Indeed, the allegations here are indistinguishable in principle from those made in Matter of Boisson v 4 E. Hous. Corp. (129 AD2d 523), in which the court concluded that a hearing into bad faith was warranted on the basis of an alleged "vendetta" arising from a prior incident involving the petitioner and the current board president.
[2] These difficulties do not arise in the more conventional applications of the "business judgment" rule to shareholder's suits involving the actions of business corporation boards, since the focus in these applications is on the alleged ulterior financial motives of the directors  a matter which is susceptible to objective verification.