OPINION OF THE COURT
 

 Gabrielli, J.
 

 This case presents the novel questions of whether and under what circumstances a court may intervene in the decision of an educational institution to withhold a diploma from one of its students on academic grounds. Specifically, we are asked to determine whether an educational institution may be estopped from asserting that a student has not fulfilled the requirements for graduation where the student’s deficiency was caused in part by his reliance upon a professor’s misleading statement regarding the institution’s grading criteria. Although we find that the facts and circumstances presented in this case did not warrant the extreme remedy of requiring the institution to award a diploma to one whom it deemed unqualified, we nevertheless refrain from holding that the principles of equitable estoppel may never be used to avoid the harsh effects of an arbitrary academic determination.
 

 The petitioner in this case, Eugene Olsson, was a candidate for a Master’s degree at the John Jay College of Criminal Justice, a branch of the City University of New York. Having completed the bulk of his studies with an "honors” average, Olsson elected to take a final "comprehensive” examination in lieu of submitting a Master’s thesis, as permitted by the school’s academic regulations. Since he was told that the examination would test his cumulative knowledge in the field of criminal justice, Olsson decided to enroll in a review course to refresh his memory of his past work in the program.
 

 Toward the end of the semester, one of the professors who was conducting the review course undertook to describe to his class the criteria that would be used in the grading of the upcoming examination. Professor Kim apparently intended to inform his students that, in addition to attaining an over-all average score of 2.8 points on the examination, they would be required to score three out of a possible five points on each of four of the five examination questions answered. In the course of relating this information, however, Professor Kim misspoke, stating: "You must have at least three out of five
 
 questions”
 
 (emphasis supplied). This uncorrected misstatement, according to Olsson, left him and several of his classmates with the
 
 *412
 
 impression that they could achieve a passing grade on the examination by scoring at least three points on only three of the five questions. As a consequence, Olsson was unpleasantly surprised when he learned that, although his over-all average score exceeded 2.8, he had nevertheless failed the examination because he had received passing scores on only three rather than four of the five questions he had answered.
 

 Believing that the outcome was unfair, Olsson petitioned the academic appeals committee of the college for a reconsideration of his grade. He thought himself aggrieved because he had budgeted his time during the examination in such a way as to maximize his chances of achieving a passing score on three of the five questions. Had he known that he would be required to perform acceptably on four questions, Olsson asserted, he would have allocated his efforts more evenly and might therefore have passed the examination. The academic appeals committee, however, declined to change Olsson’s test score to a "pass”, concluding that it would be improper to do so in view of the fact that he had failed the examination under the uniformly applied criteria. Nevertheless, in the interest of fairness, the committee offered to expunge the results of Olsson’s examination and permit Olsson to retake it without prejudice to his right to sit for the test a second time should he fail again.
 
 [1]
 

 Finding this offer to be unacceptable, Olsson commenced the instant article 78 proceeding in an effort to compel the college to award him a diploma on the strength of his existing examination score. Since he had relied on Professor Kim’s classroom statements in allocating his time during the examination and had "passed” the test under the criteria delineated in those statements, Olsson contended that the college should be estopped from applying the higher standard, which had resulted in his failing grade. Both the trial court and the Appellate Division accepted this argument and ordered the college to award Olsson a diploma in his chosen field
 
 nunc pro tunc.
 
 Both courts stressed that there existed no written regulations governing grading criteria at the time that Olsson took the examination,
 
 [2]
 
 and both courts concluded that the college
 
 *413
 
 rather than the individual student should bear the ultimate responsibility for Professor Kim’s unfortunate "slip-of-the-tongue”. We disagree.
 

 In reversing the determinations below, we are mindful that this case involves more than a simple balancing of equities among various competing commercial interests. While it is true that in the ordinary case, a principal must answer for the misstatements of his agent when the latter is clothed with a mantle of apparent authority (see, e.g.,
 
 Phillips v West Rockaway Land Co.,
 
 226 NY 507), such hornbook rules cannot be applied mechanically where the "principal” is an educational institution and the result would be to override a determination concerning a student’s academic qualifications. Because such determinations rest in most cases upon the subjective professional judgment of trained educators, the courts have quite properly exercised the utmost restraint in applying traditional legal rules to disputes within the academic community (see, e.g.,
 
 Board of Curators, Univ. of Mo. v Horowitz,
 
 435 US 78;
 
 Matter of Sofair v State Univ. of N. Y. Upstate Med. Center Coll. of Medicine,
 
 54 AD2d 287, revd on other grounds 44 NY2d 475;
 
 Matter of Bonwitt v Albany Med. Center School of Nursing,
 
 77 Misc 2d 269;
 
 Balogun v Cornell Univ.,
 
 70 Misc 2d 474; cf.
 
 James v Board of Educ.,
 
 42 NY2d 357).
 

 This judicial reluctance to intervene in controversies involving academic standards is founded upon sound considerations of public policy. When an educational institution issues a diploma to one of its students, it is, in effect, certifying to society that the student possesses all of the knowledge and skills that are required by his chosen discipline. In order for society to be able to have complete confidence in the credentials dispensed by academic institutions, however, it is essential that the decisions surrounding the issuance of these credentials be left to the sound judgment of the professional educators who monitor the progress of their students on a regular basis. Indeed, the value of these credentials from the point of view of society would be seriously undermined if the courts were to abandon their long-standing practice of restraint in this area and instead began to utilize traditional equitable estoppel principles as a basis for requiring institutions to confer diplomas upon those who have been deemed to be unqualified.
 

 This is not, of course, to suggest that the decisions of educators are completely immune from judicial scrutiny. Con
 
 *414
 
 sistent with the policy of ensuring that academic credentials truly reflect the knowledge and skills of the bearer, the courts have indicated that they will intervene if an institution exercises its discretion in an arbitrary or irrational fashion (e.g.,
 
 Matter of Sofair v State Univ. of N. Y. Upstate Med. Center Coll. of Medicine,
 
 54 AD2d, at p 290,
 
 supra).
 
 In addition, it has been suggested that there exists an "implied contract” between the institution and its students such that "if [the student] complies with the terms prescribed by the [institution], he will obtain the degree which he sought”
 
 (Matter of Carr v St. John’s Univ., N. Y.,
 
 17 AD2d 632, 633, affd 12 NY2d 802). The essence of the implied contract is that an academic institution must act in good faith in its dealings with its students.
 

 In this case, John Jay College amply fulfilled its obligation to act in good faith when it offered Eugene Olsson the opportunity to retake his comprehensive examination. Certainly, the college was not obliged to confer a diploma upon Olsson before he demonstrated his competence in accordance with the institution’s academic standards. The mere circumstance that Olsson may have been misled by Professor Kim’s unfortunate remark cannot serve to enhance the student’s position in this regard. Despite Olsson’s speculative contention that he might have passed the examination had he not been misinformed about the grading criteria, the fact remains that neither the courts nor the college authorities have any way of knowing whether the outcome of the testing would have been different if Olsson had not "relied” upon Professor Kim’s misstatement. Indeed, the fact that 23 of the 35 students enrolled in Professor Kim’s review course managed to pass the examination despite the faculty member’s "slip-of-the-tongue” serves to demonstrate that there was no necessary connection between Olsson’s exposure to the "three out of five” comment and his failure to achieve a passing score. Under these circumstances, requiring the college to award Olsson a diploma on equitable estoppel grounds would be a disservice to society, since the credential would not represent the college’s considered judgment that Olsson possessed the requisite qualifications.
 

 We hasten to add that our holding today should not be interpreted as an indication that estoppel will never lie when an educational institution seeks to withhold a diploma from one of its students on academic grounds. To be distinguished
 

 
 *415
 
 from the present case are those situations in which a student has fulfilled all of the academic requirements for graduation, but has neglected some technical prerequisite in reliance upon the assurances of a faculty member. The facts in
 
 Matter of Blank v Board of Higher Educ.
 
 (51 Misc 2d 724) are illustrative in this regard. There, the student had elected to pursue the college’s "professional option plan” after consulting with his prelaw adviser at the college. Under the plan, a student who had completed at least three quarters of his studies at the college could become entitled to a baccalaureate degree if he completed one years’ full-time work in an approved law school. The only proviso was that the student’s course of study had to "constitute, in the opinion of the Dean of Faculty, an acceptable program for the AB degree”. Since he lacked four required courses at the time he was preparing to enter law school, the student approached the guidance officer of the college and the chairperson of the applicable academic department in an effort to work out an acceptable program. The student, who was planning to attend an out-of-town law school, was unequivocally advised that he would have to enroll in the required courses at the college, but was told that he could obtain the necessary credits without actually attending classes if the individual instructors agreed. Pursuant to this advice, the student in
 
 Blank
 
 took two of the required courses over the summer "in residence” and then made arrangements with college instructors to take the two remaining courses on a "correspondence” basis. Although he passed the final examinations in each of the last two courses with a grade of "B” and received full course credit from the individual instructors, the student in
 
 Blank
 
 was denied his diploma after the dean determined that he had failed to comply with the college’s "in residence” requirement. Under these circumstances, Special Term correctly held that the dean of the college should be estopped from asserting the "in residence” requirement as a ground for withholding the student’s diploma, since the requirement had, in effect, been waived by several faculty members, all of whom could be regarded agents of the dean.
 

 The outstanding feature which differentiates
 
 Blank
 
 from the instant case is the unavoidable fact that in
 
 Blank
 
 the student unquestionably had fulfilled the academic requirements for the credential he sought. Unlike the student here, the student in
 
 Blank
 
 had demonstrated his competence in the subject matter to the satisfaction of his professors. Thus, there
 
 *416
 
 could be no public policy objection to Special Term’s decision to award a "diploma by estoppel” (accord
 
 Matter of Healy v Larsson,
 
 67 Misc 2d 374, affd 42 AD2d 1051, affd 35 NY2d 653). Moreover, although the distinction is not dispositive, it cannot be overlooked that the student in
 
 Blank
 
 had relied upon a continuous series of deliberate and considered assurances from several faculty members, while Olsson, the student in this case, premised his estoppel claim upon a single inadvertent "slip-of-the-tongue” made by one professor during the course of a single presentation.
 

 In summary, it must be stressed that the judicial awarding of an academic diploma is an extreme remedy which should be reserved for the most egregious of circumstances. In light of the serious policy considerations which militate against judicial intervention in academic disputes, the courts should shun the "diploma by estoppel” doctrine whenever there is some question as to whether the student seeking relief has actually demonstrated his competence in accordance with the standards devised by the appropriate school authorities. Additionally, the courts should be particularly cautious in applying the doctrine in cases such as this, where a less drastic remedy, such as retesting, may be employed without seriously disrupting the student’s academic or professional career.
 
 [3]
 

 For the foregoing reasons, the order of the Appellate Division should be reversed, without costs, and the petition should be dismissed.
 

 Chief Judge Cooke and Judges Jasen, Jones, Wachtler, Fuchsberg and Meyer concur.
 

 Order reversed, etc.
 

 [1]
 

 . In the ordinary case, a student was given two opportunities to pass the comprehensive examination. By expunging his first test score, the college, in effect, was wiping the record clean and giving Olsson two additional chances to pass.
 

 [2]
 

 . It should be noted that, as a result of the controversy surrounding Olsson’s examination grade, the college has decided to publish written regulations in connection with the grading of the comprehensive examination.
 

 [3]
 

 . John Jay College has conceded in its brief that its offer to permit Olsson to retake the examination remains open even at this late date. We are not unsympathetic to Olsson’s argument that this offer is a less than satisfactory remedy in view of the number of years that have passed since he prepared for the 1976 examination. We note, however, that the decision to forego the college’s offer to readminister the test at an earlier date, albeit delayed for several months, was entirely Olsson’s and, accordingly, the student cannot now be heard to say that his interests have been prejudiced by the passage of time.