William W. ALDEN, Appellant,

v.

GEORGETOWN UNIVERSITY,
Appellee.

No. 97–CV–554.

District of Columbia Court of Appeals.

Argued April 15, 1999.
Decided Aug. 12, 1999.

Woodley B. Osborne for appellant.

Mark J. Larson, Washington, for appellee.

Before SCHWELB, RUIZ, and REID,
Associate Judges.

RUIZ, Associate Judge:

William W. Alden appeals from a decision of the trial court granting summary judgment in favor of Georgetown University in his suit asserting breach of contract and seeking reinstatement following his dismissal from the University's Medical School. Alden[1] contends that the trial court erred in declining to review the University's decision to dismiss him, arguing that the issuance of a failing grade in his medicine clerkship and his resulting dismissal from the Medical School was not entitled to judicial deference as an academic decision by University officials where the failing grade was motivated by ill-will, unrelated to Alden's performance, on the part of one of the student evaluators, rather than the result of a legitimate academic judgment. Alden also challenges

1. Since the relevant time period at issue in this case, Dr. Alden has received a medical degree from Ross University in the West Indies in July 1994. However, to avoid any confusion in the text of this opinion, which principally concerns the time period during which Dr. Alden was a medical student at Georgetown, we do not refer to Dr. Alden by his title.

the trial court's decision to strike his expert witnesses on the issue of monetary damages as an abuse of discretion where the impact of the court's decision was to irreparably prejudice his ability to prove his case for damages. We affirm, concluding that there was a discernible, rational academic basis for both the failing grade and the subsequent dismissal, thereby entitling the University's decision to judicial deference, and noting, moreover, that Alden received a fair and impartial hearing on his dismissal during which time he had the opportunity to establish that his clerkship grade had been motivated solely by ill-will and to present evidence supporting his claim. In affirming the grant of summary judgment on this basis, we do not reach the issue of whether the trial court abused its discretion in striking Alden's expert witnesses.

### I.

William Alden entered Georgetown Medical School as a third-year transfer student from Ross University in the summer of 1990. During his first year at Georgetown (but third year of medical studies), Alden missed a considerable amount of time from school due to his father's illness and the destruction of his parents' Kansas home in a tornado. Despite these absences, Alden received honors and high passes in his neurology, ob-gyn, pediatrics and radiology clerkships during his third year; however, he also received a "marginal" pass in his surgery clerkship.

Near the end of his third-year medicine clerkship, Alden requested permission to take some time off from the clerkship following his father's death to attend to his father's funeral arrangements. In light of his prior absences, Alden was advised against missing additional time by Dr. Jon O'Brien, Georgetown's Associate Dean of Students. Alden nevertheless flew home on June 13, and was back at Georgetown on June 16. Alden received a passing grade for the medicine clerkship, but was given another "marginal" mark, by Dr. William P. Argy, the Medicine Clerkship Director at Georgetown University.

Georgetown's Committee on Students reviewed Alden's academic progress in September 1991, as per University policy, and decided that Alden would "perform a twelve-week remedial third year medical clerkship beginning in the second quarter [fall 1991], to be followed (if successful) by the fourth year Ambulatory Care Block."[2] The Committee also decided to review Alden's academic progress at its January 1992 meeting, and postponed a decision as to whether Alden would be eligible for graduation in 1992.

Alden successfully passed the remedial clerkship, which ran from September 1991 until mid-December 1991. He then was scheduled for his fourth-year medicine clerkship at Fairfax Hospital which would run from December 16, 1991 through January 26, 1992. However, during this time, Alden also needed to schedule interviews for his residency following graduation. Although Georgetown policy officially allows its students to take ten days off to interview for residency opportunities, no more than five days may be taken during any single clerkship unless the student first receives permission from the school. Because of his remedial clerkship, however, Alden could not begin interviewing for residencies until mid-December. To further complicate matters, Alden chose to pursue

2. *See* Information for Third and Fourth Year Students Georgetown University School of Medicine ("The Committee on Students ... meets monthly and (along with other business) reviews grades from clerkships or courses (including recommendations formulated by the Preclinical or Clinical Academic Performance Review Committees)."). *See also* Requirements for Retention and Graduation ("a pattern of marginal passes or inadequacies in any area of evaluation will not be considered satisfactory"); *id.* ("The school of medicine reserves the right to dismiss, or to deny admission, registration, readmission, or graduation to any student who, in the judgment of the school or its administrative bodies is determined to be unsuited for the study or practice of medicine.").

a neurology residency, which required completion of the interview process by January 24, 1992.

Alden requested nine days off for residency interviews during his fourth-year medicine clerkship. Two of the days requested came in December; however, Alden returned a day late. In January, Alden requested an additional seven days, which Dr. Ann Pariser, the hospital's Chief Medical Resident, granted for all but the last three days (January 21, 22, and 23). Dr. Pariser told Alden that he would have to obtain written permission for the final three days from Dr. O'Brien, the Associate Dean of Students. After meeting with Alden on January 15, 1992, Dr. O'Brien prepared a memorandum to Dr. James Cooper, Medicine Clerkship Director at Fairfax Hospital and Dr. Argy, the medicine clerkship director at Georgetown, which read in pertinent part:

> Mr. Alden's reason for the extra days in one clerkship is that he is entering the Neurology match, an early match which closes entries on February 3. This is a plausible reason for scheduling the interviews (although, as Mr. Alden knows, the Committee on Students has not made a final decision as to whether he will graduate in June 1992). *No extra time is allowed for travel in this schedule: full performance the day before and the day following is expected.*

On January 20, 1992, Alden met with Dr. Pariser to inform her that he was leaving that evening for residency interviews. Dr. Pariser had not yet received a copy of Dr. O'Brien's memorandum and warned Alden that she did not think he would be able to successfully complete his clerkship if he took the additional time off, and that until she heard otherwise from Dr. O'Brien, Alden's absences would be considered unexcused. That same day, Al-

den spoke with Dr. Cooper, who also had yet to receive Dr. O'Brien's approval of Alden's proposed absences. Dr. Cooper informed Alden that the missed days would have a negative impact on his clerkship evaluation.

On or about January 20, 1992, Dr. Jeffrey M. Drood, who, among others, was responsible for supervising Alden, wrote a strongly-worded critical evaluation of Alden's performance. Dr. Drood's negative impression of Alden was motivated in part by his belief that Alden's absences for the three days were all unexcused. In addition, Dr. Drood was friends with Dr. Argy, who had supervised Alden during his third-year medicine clerkship, and had mentioned to Dr. Drood that Alden had performed poorly in prior rotations. However, Dr. Drood also had observed independently that, on at least two occasions, Alden had failed to describe the content of a patient's laboratory reports accurately. In his evaluation, Dr. Drood wrote:

> I'm not sure what's real and what's not real with this student. He has had many undocumented absences and "tardiness." Also, he tries to get by with doing the absolute *BARE* minimum of work—his admission notes are skeletal at best, requiring him to refer to my admission notes when he is to present a patient. He has demonstrated a record of unreliability (and lack of trustworthiness) which is, frankly, unacceptable in the medicine field. It is my opinion that just allowing him to repeat the clerkship is *not* sufficient, as these traits, deep rooted (personality) and unlikely to change, make for a *dangerous* physician (especially given his long history of similar behavior).[3]

On January 23, 1992, Dr. Mary Therese O'Donnell, the Assistant Clerkship Di-

---

**3.** According to Alden, Dr. Drood later confided to him that he thought that his evaluation of Alden had been unfair and promised Alden that he would change it and talk to Drs. O'Donnell and Argy. Dr. Argy also stated in his deposition that Dr. Drood had worried aloud to him that his evaluation might have

been unduly influenced by Dr. Argy's earlier comments to Dr. Drood. However, in his deposition, Dr. Drood explained that he had made these representations to Alden in order to end the conversation and that he had no intention of changing the evaluation.

rector at Fairfax Hospital, prepared an evaluation form which was reviewed and approved by Dr. Cooper. The report gave Alden a failing grade and incorporated many of Dr. Drood's comments from his own evaluation of Alden's performance. Although Alden had also been supervised, and been given favorable reviews, by Dr. Shashi Madan, Dr. Ali Safa, and Dr. Robin Goldberg,[4] Dr. O'Donnell nevertheless gave greater weight to Dr. Drood's evaluation of Alden's performance.[5] The evaluation was forwarded to Georgetown University three days before the conclusion of Alden's clerkship for consideration by the Committee on Students. Alden returned to Fairfax Hospital and worked on January 24–26, and presented his medical topic and presentation and paper on January 24, a day after his evaluation had already been completed and forwarded to the Committee.

The Committee on Students held its scheduled meeting on January 23, 1992, and, the following day, notified Alden that it had decided that he would not be able to graduate by June 1992, and that it would defer consideration of the consequences of his failing grade until he had had a chance to review the evaluation and appear before the committee.[6] Prior to the meeting, Alden approached Dr. Cooper, Dr. Argy, and Dr. Robert Jacobson, Chairman of the Georgetown Department of Medicine, to ask them to re-evaluate his grade. None of them agreed to do so. At the February 20, 1992 meeting, Alden appeared before the Committee and argued his case. After reviewing Alden's entire academic record, including material which Alden had submitted or requested to be added to the file, the Committee voted to drop Alden from the school rolls.

Alden then appealed the decision to the Committee on Student Appeals as permitted by Georgetown policy. That committee met on March 26, 1992 to consider Alden's case, and Alden was again interviewed and given an opportunity to supplement his file. The appeals committee affirmed the earlier decision to dismiss Alden from the school, thereby ending Alden's career at Georgetown.[7] As a result of his dismissal, the neurology residency he had obtained at Baylor University was rescinded.

---

4. Both Dr. Madan and Dr. Safa would have recommended Alden for a "high pass."

5. Alden argues that improper weight was given to Dr. Drood's evaluation because the greater weight should have been given to "[t]he resident who spent the most time with the student." In his case, Alden states that Dr. Madan actually spent the most time with him because Alden was "on call" three times with Dr. Madan, as opposed to twice with Dr. Drood. Georgetown points out, however, that there is uncontested testimony that Dr. Madan told Dr. O'Donnell that she did not believe that she had spent enough time with Alden to feel comfortable evaluating him.

6. Georgetown's "Information for Third and Fourth Year Students Georgetown University School of Medicine" sets forth the Committee on Students' guidelines and provides in pertinent part:

2. Any student receiving a failure in one course may be dropped from the rolls of the school. This would be more apt to happen in a student who has a weak prior academic record.

7. Several months after Alden's dismissal, Georgetown officials discovered that during the application process to the medical school, Alden failed to inform the school about disciplinary sanctions imposed against him for various infractions while he was attending Princeton University as an undergraduate. In addition, Alden had not informed the school that the Association of American Medical Colleges had issued a "report of irregularity" to all the medical schools to which Alden had previously applied after discovering that he had lied about his academic record on previous medical school applications. In an affidavit, Dr. William Maxted, the Medical School's Dean of Academic Affairs and Chairman of the School's Admission Committee at the time Alden applied to Georgetown, stated that had the school known of Alden's history of misconduct during the time he was a student at the school, "the School would have considered him unfit for the study and practice of medicine and would have sought to have him dismissed."

Alden filed this suit against Georgetown University in February 1994. In July 1994, Alden received a medical degree from Ross University. He again applied for neurology residencies but did not match anywhere. However, on July 1, 1996, Alden began a residency at Tulane University. The most recent information in the record reveals that at the conclusion of that residency, he was to begin a residency in neurology at Louisiana State University in July 1997.

## II.

Although recognizing the policy of judicial deference to educational institutions engaging in academic decision making, Alden argues that fairness requires that courts nevertheless carefully consider the facts underlying a student's dismissal for academic reasons to ensure that the school's actions were the result of a legitimate academic judgment, rather than the product of ill-will unrelated to the student's academic performance. Alden asserts that his dismissal from Georgetown's rolls was premised on a clerkship evaluation which was motivated by ill-will on the part of the resident evaluator, rather than for academic reasons. As such, Alden contends that there is a material question of fact whether Georgetown's decision to dismiss him is entitled to judicial deference because it was an academic decision. Alden also argues that Georgetown breached the implied covenant of good faith and fair dealing by failing to evaluate his academic performance in good faith and on the merits, rather than based on factors unrelated to academic performance. Moreover, Alden asserts that Georgetown is estopped from dismissing him because the negative evaluations which caused his dismissal were premised on the evaluators' mistaken belief that Alden had taken unexcused absences to attend his residency interviews when, in reality, he had been given permission to take leave by university officials. Finally, Alden contends that the trial court abused its discretion in striking his experts on the issue of damages because Alden's failure to comply fully with Rule 26(b)(4) was not willful and the court's decision severely prejudiced Alden's ability to prove his case for economic damages.[8]

### A. Whether Alden's complaint is moot.

■ As a preliminary matter, Georgetown argues that Alden's complaint should be dismissed as moot because Alden seeks only injunctive relief to compel Georgetown to re-evaluate his clerkship grades, reinstate him to the medical school, and submit letters of correction to his file.

---

**8.** In his initial complaint, Alden sought solely injunctive relief reinstating him as a medical student. By scheduling order entered September 2, 1994, Alden was given until December 16 as the deadline for filing his expert designation statement under Rule 26(b)(4). At the top of the order, the trial court wrote: "Both counsel informed that absent extraordinary circumstances there will be no continuances of any of the dates set out in this Scheduling Order." On December 19, 1994, Alden, intending to amend his complaint in order to seek monetary damages based on the lost value of a Georgetown University medical degree, filed his 26(b)(4) statement, designating two vocational experts and an economist and University medical degree, filed his 26(b)(4) statement, designating two vocational experts and an economist and stating that "[a] summary of the facts and opinions to which each expert is expected to testify and the grounds therefor shall be provided to Defendant." In granting Alden's request for an extension of time to respond to Georgetown's discovery requests, the court reiterated in a December 19, 1994 order that "all deadlines on the Scheduling Order of September 2, 1994 remain *unmodified.*" On January 20, 1994, Georgetown filed a motion to strike Alden's proposed experts, arguing that the sanction was warranted because Alden had failed to comply with Rule 26(b)(4) within the time limits established by the scheduling order. This motion was granted on February 15, 1995. In denying Alden's subsequent motion for reconsideration on March 29, 1995, the court acknowledged that striking Alden's experts would be "tantamount to dismissing his [economic damages] claim," but cited Alden's apparent willful disregard of the trial court's repeated "direct admonitions to the parties that no extensions of time would be given absent extraordinary circumstances" and stated that "any lesser sanctions would have allowed Plaintiff to make a mockery out of [the trial court's] orders."

Since he filed his lawsuit, Alden has received a medical degree from Ross University and, according to his deposition taken February 14, 1997, he was to become a resident in neurology at Louisiana State University on July 1, 1997. Consequently, Georgetown asserts that Alden has effectively abandoned his claims by deed, rendering this complaint moot. Because Alden's subsequent decision to finish his studies at Ross University does not necessarily place him in the same position as he would have been had he been permitted to complete his degree at Georgetown, we conclude that Alden's cause is not moot.

While it would be inappropriate for a reviewing court " 'to adjudicate the merits of the appeal ... merely to record (its) views concerning a controversy which no longer exists and to rule on a question which has become moot and purely academic,' " *Banks v. Ferrell,* 411 A.2d 54, 56 (D.C.1979) (quoting *Price v. Wilson,* 32 A.2d 109, 110 (1943)), in the instant case, Alden's claim has not become "purely academic" because Alden has not received the remedy which he originally sought in his complaint, that is, reinstatement to Georgetown Medical School. As Alden points out, "[m]edical degrees from Ross and Georgetown are not fungible commodities," and possession of a Ross degree may not be as valuable or prestigious in terms of professional opportunities for which Alden may be eligible in the future. Moreover, Georgetown made no representations to the trial court that it would remove any reference to Alden's dismissal from its records if the complaint were to be dismissed as moot. *Cf. Greene v. Howard Univ.,* 134 U.S.App. D.C. 81, 83–84, 412 F.2d 1128, 1131–32 (1969) (conditioning dismissal for mootness on university's complete effacement of any reference of students' absence from the university's rolls). Thus, Alden has a continued interest in eliminating the stigma of his dismissal from Georgetown. *Cf. Mahavongsanan v. Hall,* 529 F.2d 448, 449 (5th Cir.1976) (case not moot where university had further interest in eliminating "an ongoing stigma of erosion of their academic certification process"). Finally, if we were to reverse both the trial court's grant of summary judgment (thereby reinstating Alden's original complaint) and the trial court's decision to strike Alden's expert witnesses, he would be entitled to renew his motion to amend his complaint to add a claim for monetary damages. Accordingly, we proceed to evaluate the merits of Alden's claims.

*B. Propriety of judicial review of Georgetown's decision to drop Alden from its rolls.*

This court has recognized that a judgment by school officials that a student has not performed adequately to meet the school's academic standards is a determination that usually calls for judicial deference. *See Kraft v. W. Alanson White Psychiatric Found.,* 498 A.2d 1145, 1149 (D.C.1985) (citing *Board of Curators of the Univ. of Mo. v. Horowitz,* 435 U.S. 78, 89–90, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978)). However, relying on the "general proposition [that] summary judgment is likely to be inappropriate when issues of motive or intent are material," *Glekas v. Boss & Phelps, Inc.,* 437 A.2d 584, 587 (D.C.1981), Alden argues that a trial court will not be precluded from reviewing a school's decision to dismiss a student for unsatisfactory academic performance where the student alleges that the institution's proffered academic reason for dismissal is only a pretext for a dismissal motivated by ill-will or malice. Accordingly, Alden urges this court to reverse the trial court's grant of summary judgment in favor of Georgetown University Medical School.

In *Kraft, supra,* this court followed the lead of the Supreme Court as well as other courts across the country in declining to engage in judicial review of academic decision-making by educational institutions. In *Horowitz, supra,* the Supreme Court, in declining to decide the accuracy of a judgment by school officials that a student had not displayed the clinical ability required of a medical doctor, recognized that there were distinct differ-

ences between a decision to suspend or dismiss a student for disciplinary purposes and a similar action taken for academic reasons, in that the latter:

> is by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision. Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decision making.

*Id.* at 90, 98 S.Ct. 948. The Court expanded on its stance of judicial deference in academic decisions in *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), reiterating that courts should show great respect for a teacher's professional judgment, and stating that courts should not overturn an academic decision "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* at 225, 106 S.Ct. 507 (citing *Youngberg v. Romeo*, 457 U.S. 307, 323, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). Accordingly, in cases involving academic dismissal, educational institutions will be entitled to summary judgment unless the plaintiff can provide some evidence from which a fact finder "could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will unrelated to academic performance." *Clements v. Nassau County*, 835 F.2d 1000, 1004 (2d Cir.1987); *see also Greenhill v. Bailey*, 519 F.2d 5, 10 n. 12 (8th Cir.1975) ("For a court to overturn a student's dismissal on substantive grounds it must find that such a dismissal was arbitrary and capricious.... Only the most compelling evidence of arbitrary or capricious conduct would warrant our interference with the performance evaluation (grades) of a dismissed student made by his teachers."); *Bilut v. Northwestern Univ.*, 269 Ill.

App.3d 125, 206 Ill.Dec. 531, 645 N.E.2d 536, 543 (Ill.App.Ct.1994) ("A plaintiff's burden of establishing arbitrary and capricious conduct on the part of a private college or university ... is a heavy one. A plaintiff must show his dismissal was without any discernible rational basis.") (internal quotations and citations omitted); *cf.* Claudia G. Catalano, "Liability of Private School or Educational Institution for Breach of Contract Arising From Expulsion or Suspension of Student," 47 ALR 5th 1, 27 (1997) ("it has been said that a school has 'absolute discretion' to determine whether a student failed to meet its academic standards, absent positive proof by the student that the exercise of discretion was not honest, but arbitrary or malicious").

This "judicial reluctance to intervene" is based upon "sound considerations of public policy." *Olsson v. Board of Higher Ed.*, 49 N.Y.2d 408, 426 N.Y.S.2d 248, 402 N.E.2d 1150, 1153 (1980). When a school issues a diploma to one of its students, it certifies to society that the student is well-versed in all of the knowledge and skills required by his or her chosen profession. *See id.* Thus, to ensure society's confidence in the qualifications of individuals who have graduated from a particular educational institution, "it is essential that the decisions surrounding the issuance of these credentials be left to the sound judgment of the professional educators who monitor the progress of their students on a regular basis." *Id.* In addition, to involve the courts in assessing the propriety of a particular grade would encourage endless litigation by unsuccessful students and "undermine the credibility of the academic determinations by educational institutions." *Susan M. v. New York Law Sch.*, 76 N.Y.2d 241, 557 N.Y.S.2d 297, 556 N.E.2d 1104, 1107 (1990). This rule of judicial nonintervention is "particularly appropriate in the health care field" where the students who receive degrees will provide care to the public, *Burke v. Emory Univ.*, 177 Ga.App. 30, 338 S.E.2d 500, 501 (1985); *see also Bilut, supra,* 206 Ill.Dec. 531, 645 N.E.2d

at 542, and because "'courts are not supposed to be learned in medicine and are not qualified to pass opinion as to the attainments of a student in medicine.'" *Jansen v. Emory Univ.,* 440 F.Supp. 1060, 1063 (N.D.Ga.1977) (quoting *Connelly v. Univ. of Vt. and State Agric. College,* 244 F.Supp. 156, 160–61 (D.Vt.1965)).[9]

■ Public policy reasons aside, the record on appeal simply does not support Alden's allegation that the sole cause for his dismissal was Dr. Drood's ill-motivated evaluation. In reality, Alden's poor academic performance during his third year also provided a basis for his dismissal and certainly put him on notice that any further academic difficulties could potentially prevent him from graduating from Georgetown. Although Alden performed well in certain clerkship units during his third year, he also received "marginal" passes in his surgery and medicine clerkships. His surgery clerkship director wrote that Alden's "clinical skills and assessment were both below what was expected and that his deficiency had to be compensated for by other members of the team." Dr. Argy, Georgetown's medicine clerkship director, noted that Alden's "written analysis of patients lacks synthesis and did not always focus directly on the patient. It is felt that this individual is operating substantially below his intellectual capacity." Due to his poor performance, Alden's record came under the scrutiny of the Committee on Students, which met in the fall of 1991 and determined that Alden would have to do a remedial clerkship in medicine—well before Dr. Drood's allegedly ill-motivated evaluation. The Committee also notified Alden by letter that it would again review his record after his remedial clerkship at its January 1992 meeting and that no decision had been made as to whether he would be able to graduate in 1992.

In addition, various administration documents given to Georgetown medical students discussed the requirements for successful completion of the medical curriculum. *Cf. Pride v. Howard Univ.,* 384 A.2d 31, 34 (D.C.1978) (provisions of the university's code of conduct, contained in a manual given to each student, constituted a part of the contract between a university and its students). For example, the Information for Third and Fourth Year Students–Georgetown University School of Medicine informed students that:

> A Fail in a clinical clerkship signifies a grave doubt by the faculty that the student is suitable for the study and practice of medicine. A Low Pass in a clinical clerkship raises a serious question of suitability, and several Low Passes may tip the scale . . . .

In addition, the Requirements for Retention and Graduation provided:

> Passing grades in individual courses *do not guarantee* that a student's performance, when viewed as a whole, will meet requirements for earning the medical degree. For example, a pattern of marginal passes or inadequacies in any area of evaluation will not be considered satisfactory.
>
> . . . .
>
> The school of medicine reserves the right to dismiss, or to deny admission, registration, readmission, or graduation to any student who, in the judgment of the school or its administrative bodies is determined to be unsuited for the study or practice of medicine.

(Emphasis added.)

Thus, before Alden's fourth year of studies ever began, he was placed on notice that he was on academic thin ice. Yet, as the trial court noted, Alden returned a day late from an approved absence in December, took three additional days for interviews and then, after being told that no more absences would be excused without written administration approval, left for three more days even though he was informed by the staff at Fairfax Hospital that the requisite approval had not been

---

**9.** These considerations are particularly apt where the institution involved is a *private* college or university. *See Bilut, supra,* 206 Ill.Dec. 531, 645 N.E.2d at 541.

received and, thus, that his absences would be considered to be unexcused. It was in this context that the evaluation that Alden contends was motivated out of malice and ill-will was written. Although Dr. Drood's negative evaluation may have been motivated at least in part by his mistaken impression that Alden's absences were unexcused,[10] Dr. Drood also had observed on at least two occasions that Alden was not sufficiently prepared to discuss patients' laboratory reports. In addition, Dr. Drood's evaluation was approved and endorsed by each of the Fairfax Hospital staff members responsible for overseeing Alden's clerkship. Each of these individuals, including Dr. Pariser, Dr. O'Donnell and Dr. Cooper, agreed with Dr. Drood that Alden's academic performance was unsatisfactory and that he should be given a failing grade. Far from lacking a rational basis for dismissal, the Committee on Students had sufficient *academic* evidence in the record from which to determine that Alden should be dropped from the school's rolls.

Moreover, Alden received a fair and impartial hearing on his grievance, as he was given two separate opportunities to present his case, once before the Committee on Students, and once before the Committee on Student Appeals. *See Burke, supra,* 338 S.E.2d at 501. Each time Alden was allowed to argue his case *and* supplement the record with any additional materials he so desired. As Alden had claimed that Drs. Pariser, O'Donnell and Cooper had improperly based their evaluation of his performance solely on Dr. Drood's recommendation and ignored the evaluations given by Drs. Safa and Madan, Alden presumably entered the evaluations of the latter two doctors into the record during his presentations before the respective committees. Alden also presumably submitted Dr. O'Brien's letter to Drs. Cooper and Argy granting him permission to take the controversial three days off to substantiate his claim that his absences had not been unexcused. Both the Committee on Students and Committee on Student Appeals noted in their letters to Alden that they had interviewed him and reviewed his entire record before deciding that he could not continue his studies at Georgetown. Alden has neither alleged that those decisions were based on ill-will or malice, nor made any procedural challenges to the review process. Thus, as there was sufficient evidence in the record from which a fact-finder could conclude that there was a rational basis for Georgetown's decision to dismiss Alden, the trial court did not err in granting summary judgment in favor of Georgetown. *See Doe, supra,* 780 F.Supp. at 631; *Bilut, supra,* 206 Ill.Dec. 531, 645 N.E.2d at 543.[11] *Cf. Frabotta v. Meridia*

10. Even if Dr. Drood's evaluation was a product of ill-will, his negative reaction to Alden was a result of his perception that Alden's absences were unexcused, and was therefore related to Alden's academic performance. *See Doe v. Washington Univ.,* 780 F.Supp. 628, 631 (E.D.Mo.1991) (summary judgment denied on challenge of academic decision only if evidence in record from which jury could conclude that no rational basis existed for decision or "that it was motivated by bad faith or ill will *unrelated to academic performance*") (emphasis added) (citations omitted). *Cf. Horowitz, supra,* 435 U.S. at 81, 90, 98 S.Ct. 948 (declining to review medical school's academic decision to dismiss respondent due to her sub-standard performance in patient-oriented settings, *erratic attendance record* and poor personal hygiene).

11. While Alden asserts that the relationship between a student and university is contractu-

al in nature, *see Pride, supra,* 384 A.2d at 34, this "contract" is premised on the notion that if the student complies with the university's academic standards and completes his or her degree requirements, he or she will be entitled to receive a degree. *See Bilut, supra,* 206 Ill.Dec. 531, 645 N.E.2d at 542. As has been discussed, Alden did not meet the university's academic standards and therefore was not eligible to receive his degree. Alden has not cited any regulation or policy breached by Georgetown, a private university. *See Jansen, supra,* 440 F.Supp. at 1062 (recognizing that private universities are not subject to constitutional due process constraints imposed on state institutions and that a student's rights to a review of a dismissal for academic reasons are defined contractually as expressed in bulletins and catalogue of university); *Williams v. Howard Univ.,* 174 U.S.App. D.C. 85, 87, 528 F.2d 658, 660 (1976) (same); *Burke, supra,* 338 S.E.2d at 501 (same); *cf. Boehm v.*

*Huron Hosp. Sch. of Nursing,* 102 Ohio App.3d 653, 657 N.E.2d 816, 818 (1995) ("The purpose of judicial relief is to assure the student fair treatment, and not for the court to reweigh or reevaluate the grades or the basis of the dismissal.") (citations omitted).[12]

For the foregoing reasons, we affirm the trial court's decision granting Georgetown University's motion for summary judgment.[13]

*Affirmed.*

*University of Pa. Sch. of Veterinary Med.,* 392 Pa.Super. 502, 573 A.2d 575, 579 (1990) (noting that majority of courts characterize relationship between a private college and its students as contractual in nature, and that students being disciplined "are entitled only to those procedural safeguards which the school specifically provides").

Nor has Georgetown, by virtue of the two hearings granted to Alden, breached the implied covenant of good faith and fair dealing. Alden was given an opportunity to argue his case to both the Committee on Students and the Committee on Student Appeals, as well as to supplement the record with any materials that he deemed relevant. Both committees considered Alden's entire record and his proffered reasons why his clerkship grade was invalid, yet upheld both the grade and the decision to drop him from the rolls. Alden has not argued that the committees' decisions were based on bad faith or were arbitrary and capricious. Under these circumstances, Georgetown cannot be found liable for breach of the implied covenant of good faith and fair dealing.

12. Because we agree with the trial court that Georgetown's decision to drop Alden from the rolls was an academic decision to which courts traditionally have deferred, we need not decide whether an independent basis for Alden's dismissal, *i.e.,* his misrepresentation of his prior disciplinary record, existed. However, we note that because Alden contends that Georgetown officials knew, before admitting him, about his problems at Princeton, summary judgment on that claim would have been inappropriate because an issue of material fact remained in dispute.

13. As Alden concedes, if this court affirms the grant of summary judgment, we need not address the issue of whether the trial court abused its discretion in striking his expert witnesses.