Louis E. WRIGHT, Jr., Appellant,

v.

HOWARD UNIVERSITY, Appellee.

No. 12–CV–110.

District of Columbia Court of Appeals.

Argued Nov. 8, 2012.

Decided Feb. 14, 2013.

Karen A. Khan, Washington, for appellant.

Daniel I. Prywes, Washington, for appellee. Marshall W. Taylor, Columbia, was on the brief for appellee.

Before THOMPSON and McLEESE, Associate Judges, and FARRELL, Senior Judge.

McLEESE, Associate Judge:

Howard University denied Dr. Louis Wright's application for tenure. Dr. Wright filed suit, alleging breach of contract and of the implied covenant of good faith and fair dealing. The trial court granted Howard's motion for summary judgment, finding that Dr. Wright's contract claims were time-barred and that Dr. Wright's implied-covenant claim did not raise a genuine dispute of material fact. Dr. Wright challenges both rulings on appeal. We affirm.

## I.

The basic facts are undisputed. Dr. Wright began working as a lecturer in the

Political Science Department at Howard in 1988. In 2001, he was appointed to a two-year, tenure-track probationary position as assistant professor. In 2003 and 2005, Dr. Wright sought and received additional two-year appointments. Dr. Wright apparently never received a formal, in-person performance evaluation during this time, although his applications for reappointment were reviewed and approved in 2003 and 2005. In addition, the Political Science Department did not provide Dr. Wright with criteria for obtaining tenure, other than the general criteria listed in the Faculty Handbook.

In 2006, during his third two-year appointment, Dr. Wright applied for tenure. He had not published any books, book chapters, or peer-reviewed articles in the preceding ten years. One month after he applied for tenure, Dr. Wright had a paper accepted for publication by a peer-reviewed journal. Dr. Wright's application was supported by the Political Science Department's Appointment, Promotion, and Tenure Committee; the Chairman of the Political Science Department; and—despite an initial negative evaluation—the Dean of the College of Arts and Sciences. The President of Howard, however, ultimately accepted the recommendation of the University Provost that the application should be denied. Howard notified Dr. Wright of the denial by letter dated November 5, 2007. Dr. Wright indicated that he received the letter on November 16, 2007.

The Faculty Handbook, which the parties agree is a contract, states that each faculty member "shall be evaluated at least every 2 years." The Faculty Handbook also directs each school or college to produce specific performance criteria for fac-

ulty positions and for obtaining tenure, and states that "[g]ood practice requires that . . . the precise terms and conditions . . . be stated in writing," and "fairness . . . prescribes that [probationary faculty members] be informed . . . of the substantive and procedural standards that will be followed in determining whether . . . tenure will be granted." Dr. Wright alleges that Howard breached its contractual obligations to evaluate him and to provide him with specific tenure criteria, and further alleges that those breaches were a substantial factor in the denial of his application for tenure. Dr. Wright also alleges that inconsistent and inaccurate assertions made by the Howard officials who reviewed his tenure application support a conclusion that Howard's denial of Dr. Wright's application for tenure breached the implied covenant of good faith and fair dealing.

## II.

### A.

The trial court granted summary judgment on Dr. Wright's contract claim on the ground that the claim was time-barred as a matter of law. We review this ruling de novo. *Williams v. District of Columbia*, 902 A.2d 91, 94 (D.C.2006); *see also, e.g., Brin v. S.E.W. Investors*, 902 A.2d 784, 800 (D.C.2006) ("[w]hat constitutes the accrual of a cause of action is a question of law") (internal quotation marks omitted). A contract action must be brought within three years of the date on which the "right to maintain the action accrues." D.C.Code § 12–301(7) (2001). An action for breach of contract generally accrues at the time of the breach.[1] *See,*

1. Under the "discovery rule," the running of a limitations period may in some circumstances be tolled until the plaintiff knows or reasonably should have known of the injury. *See, e.g., Ehrenhaft v. Malcolm Price, Inc.*, 483 A.2d 1192, 1203 (D.C.1984) (applying discov-

*e.g.*, *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 319–20 (D.C.2008). Dr. Wright filed his complaint on November 9, 2010, so his claim for breach of contract was untimely unless the cause of action accrued within three years of that date.

With respect to the alleged failure to evaluate, the trial court noted that Dr. Wright had received a series of two-year probationary appointments, the last of which extended from August 16, 2005, to May 15, 2007. The trial court reasoned that Howard's latest failure to evaluate Dr. Wright at least every two years therefore would have occurred on May 15, 2007, which was outside the three-year limitations period. With respect to the alleged failure to provide specific tenure criteria, the Faculty Handbook requires that tenure criteria be provided to probationary faculty at the beginning of the year in which they are evaluated for tenure, which in this case would be the beginning of the 2006–2007 school year. The trial court viewed any breach of that requirement as being "not within the ... limitations period."

On appeal, Dr. Wright does not argue that the trial court erroneously determined when the alleged breaches occurred.[2] He raises two other arguments, but we do not find those arguments persuasive.

First, Dr. Wright objects that the trial court impermissibly raised the statute of limitations sua sponte with respect to Howard's alleged failure to provide specific tenure criteria. Dr. Wright, however, presented his breach-of-contract claim as one count, not as two discrete claims. Complaint 5; Pl.'s Mem. of P. & A. in Opp'n to Def.'s Mot. for Summ. J. 18. Moreover, Howard did assert that the breach-of-contract claim was time-barred, both generally and specifically with respect to the alleged failure to provide specific tenure criteria. Answer 6; Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. 11.

Second, Dr. Wright argues that his cause of action for breach of contract did not accrue until, at the earliest, the date Howard denied Dr. Wright tenure, because it was only then that Dr. Wright suffered an injury that entitled him to damages. Dr. Wright's argument is flawed in several respects. Although Dr. Wright contends that he suffered no injury until he was denied tenure, his suit rests on the contrary premise that Howard's alleged breaches injured him well before he was denied tenure, because those breaches deprived him of his rights (1) to be advised of any deficiencies in his performance so that he could correct them

---

ery rule in case involving contract claim for defective construction work). The trial court appears to have concluded that the discovery rule applied in this case, but that Dr. Wright's claim was untimely under that rule. On appeal, Dr. Wright argues that the discovery rule does not apply. Because Dr. Wright disavows the discovery rule, and because we conclude that Dr. Wright's claim of breach of contract is untimely without regard to the rule, we need not and do not address the rule's potential application in this case.

**2.** At one point in his brief on appeal, Dr. Wright refers in passing to Howard's alleged breaches as "continuous." If Howard's al-

leged breaches could properly be viewed as continuing, rather than as discrete acts, that might affect the proper determination of the limitations period. *See generally Jones v. Howard Univ.*, 574 A.2d 1343, 1347–48 (D.C. 1990). Dr. Wright provides no argument of any kind, however, in support of a contention that the alleged breaches at issue in this case should have been viewed as continuing. That issue is therefore not before us, and we do not address it. *See, e.g.*, *Bardoff v. United States*, 628 A.2d 86, 90 n. 8 (D.C.1993) (treating claim as abandoned, where appellant mentioned claim but did not provide supporting argument); D.C.App. R. 28(a)(8).

before the tenure decision was made, and (2) to be advised of the specific criteria governing tenure determinations, so that he could take timely steps to meet those criteria.

■■■ Moreover, the absence of specific monetary injury does not prevent the accrual of a cause of action for breach of contract. Even where monetary damages cannot be proved, a plaintiff who can establish a breach of contract is entitled to an award of nominal damages. *See, e.g., Bedell v. Inver Housing, Inc.,* 506 A.2d 202, 205 (D.C.1986) ("[W]here a plaintiff proves a breach of contractual duty he is entitled to damages; however, when he offers no proof of actual damages ... he is entitled to no more than nominal damages.") (internal quotation marks omitted); *Chandler & Taylor Co. v. Norwood,* 14 App.D.C. 357, 363 (D.C.Cir.1899) (rejecting claim that complaint for breach of contract failed to state cause of action because complaint did not specify amount of damages; "From every breach of contract the law will imply at least nominal damages; but it is the breach of contract, not the amount of damage sustained, ... even though no actual or positive damage has been sustained, which gives the ground of action.").[3]

■■■ More specifically, it is settled in this jurisdiction that the absence of "substantial or consequential damages" does not prevent the limitations period from beginning to run on a claim for breach of contract. *Reynolds Metals Co. v. McCrea,* 99 A.2d 84, 85 (D.C.1953) ("The gist of the action is the breach, and not the conse-

quential damages which may subsequently accrue. * * * Nominal damages at least can be recovered immediately upon the happening of the breach, and the Statute of Limitations then begins to run; its operation is not delayed until substantial or consequential damages accrue.") (internal quotation marks omitted). *Reynolds* forecloses Dr. Wright's claim that the statute of limitations did not begin to run in this case until Howard denied Dr. Wright's application for tenure. *Cf. Taha v. William Marsh Rice Univ.,* No. H–11–2060, 2011 WL 6057846, at *5 (S.D.Tex. Dec. 6, 2011) (breach-of-contract claim accrued when university breached contract by failing to provide performance evaluation, not when plaintiff later was informed that university viewed his teaching as substandard).

Although Dr. Wright relies on *Tsintolas Realty Co. v. Mendez,* 984 A.2d 181 (D.C. 2009), that decision does not dictate a contrary conclusion. Dr. Wright accurately points out that the court in *Tsintolas* quoted the following language from two out-of-jurisdiction decisions: "[M]ere . breach without proof of monetary loss is *injuria absque damno, i.e.,* a wrong which results in no loss or damage, and thus cannot sustain an action." *Id.* at 187 (internal quotation marks and citation omitted; quoting *Cagle v. Southern Bell Tel. & Tel. Co.,* 143 Ga.App. 603, 239 S.E.2d 182, 183 (1977), and *Mira v. Nuclear Measurements Corp.,* 107 F.3d 466, 473 (7th Cir. 1997)). The holding of the court in *Tsintolas,* however, was that although a group of tenants had breached an agreement with their landlord to keep a settlement agree-

---

**3.** Leaving aside nominal damages, a cause of action for breach of contract can also lie, even in the absence of proof of monetary injury, if the plaintiff can establish entitlement to declaratory relief or specific performance. *Cf., e.g., Scrimgeour v. Magazine,* 429 A.2d 187, 187–90 (D.C.1981) (upholding declarato-

ry judgment in dispute over partnership agreement); *Borchardt v. Demas,* 88 U.S.App. D.C. 175, 175, 187 F.2d 517, 517 (1951) (per curiam) (upholding order granting specific performance of stock-purchase option agreement).

ment confidential, that was not a material breach precluding the tenants' motion to enforce the settlement agreement, given that the settlement agreement had already been made part of the public record. *Id.* at 187. Language that *Tsintolas* merely quoted from other courts, in deciding an issue unrelated to the issue currently before this court, does not provide a basis for disregarding the prior holdings of this court regarding when a cause of action for breach of contract accrues and when the statute of limitations begins to run in a breach-of-contract case.[4]

For the foregoing reasons, we cannot accept Dr. Wright's contention that the statute of limitations began to run in this case only after Howard denied Dr. Wright's tenure application. Accordingly we affirm the trial court's dismissal of Dr. Wright's breach-of-contract claim.

## B.

The trial judge found that Dr. Wright's factual allegations, if proved, would not state a breach of the implied covenant of good faith and fair dealing. We review a grant of summary judgment de novo, viewing the facts in the light most favorable to the non-moving party. *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583 (D.C.2001). We affirm the trial court's grant of summary judgment for Howard on Dr. Wright's implied-covenant claim.

Every contract includes an implied covenant of good faith and fair dealing. *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C.2006). The meaning of "good faith" varies with the context. *Restatement (Second) of Contracts* § 205, cmt. a (1981). "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." *Allworth,* 890 A.2d at 201–02 (quoting *Restatement (Second) of Contracts* § 205, cmt. a (1981)). Bad faith requires more than mere negligence; examples include lack of diligence, purposeful failure to perform, and interference with the other party's ability to perform. *Id.* at 202. Fair dealing means reasonable conduct that is not arbitrary and capricious. *Id.* To state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege either bad faith or conduct that is arbitrary and capricious. *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1112 n. 11 (D.C.1999).

A claim that a university breached the implied covenant of good faith and fair dealing in making employment decisions involving faculty members implicates the principle of academic freedom. *See Allworth,* 890 A.2d at 202 ("[C]oncepts of

---

4. Dr. Wright also cites in passing *Delaware State Coll. v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), for the proposition that the limitations period began when Howard made the decision to deny tenure and notified Dr. Wright of that decision. *Ricks*, however, does not address the limitations period for a contract claim; the plaintiff in *Ricks* alleged that the university unlawfully denied him tenure because of discrimination based on his national origin. *Ricks*, 449 U.S. at 254, 101 S.Ct. 498. In contrast, Dr. Wright does not dispute that the alleged breaches of contract in this case occurred before Howard made its tenure decision. Moreover, *Ricks* undermines rather than supports Dr. Wright's contention, because the court in *Ricks* rejected the claim that the statute of limitations began to run only after the plaintiff was ultimately discharged, not when the allegedly unlawful act occurred. *Id.* at 258, 101 S.Ct. 498 ("[T]he proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful.") (internal quotation marks omitted).

academic freedom and academic judgment are so important that courts generally give deference to the discretion exercised by university officials."). "[C]ourts should not invade, and only rarely assume academic oversight, except with the greatest caution and restraint, in such sensitive areas as faculty appointment, promotion, and tenure, especially in institutions of higher learning." *Id.* (internal quotation marks omitted). "This is not to say that a court may never examine university promotion and tenure decisions," *id.*, but it is to say that the implied covenant of good faith and fair dealing should not be interpreted so broadly that courts end up "substitut[ing their] judgment improperly for the academic judgment of the school." *Id.*

In support of his implied-covenant claim, Dr. Wright contends that the evidence supports the following factual conclusions. The Dean of the College of Arts and Sciences initially recommended against granting tenure because Dr. Wright lacked recent publications, but later conceded that he never read an article by Dr. Wright that had recently been accepted for publication. Later, the Dean changed his mind and recommended that Dr. Wright receive tenure. The Dean said that he changed his mind because Dr. Wright appealed, but then acknowledged that Dr. Wright did not file a formal appeal. According to Dr. Wright, a jury could reasonably infer that the Dean lied to cover up his initial failure to read Dr. Wright's article.

Dr. Wright further contends that the evidence supports a conclusion that the Provost cited false reasons for denying tenure to Dr. Wright. The Provost told Dr. Wright that Dr. Wright had failed to exceed minimum tenure requirements, but the Provost later testified that he did not recall the minimum tenure requirements and was not familiar with the Political Science Department's tenure require-

ments. Although the Political Science Department's Appointment, Promotion, and Tenure Committee concluded that Dr. Wright had a distinguished service record, the Provost stated that Dr. Wright had no record of service to the university or community. Dr. Wright asserts, however, that there is no requirement for service in the Faculty Handbook. Dr. Wright also points out that the Provost later admitted that Dr. Wright's work on the Patricia Roberts Harris Selection Committee qualified as service to the university and that he did not know if any of the activities listed on Dr. Wright's tenure application qualified as service to the community.

In addition, Dr. Wright claims that the Provost illogically treated Dr. Wright's accepted publication as different from an actual publication, even though the Political Science Department treated accepted publications as sufficient for evaluating tenure candidacy. The Provost said that it was unclear whether Dr. Wright's article was peer-reviewed but had previously acknowledged that the article was peer-reviewed. The Provost also asserted that Dr. Wright's article was not accepted by a political-science journal, but then acknowledged that he did not know if the journal that accepted Dr. Wright's article was a political-science journal, and said that he could not name any acceptable political-science journals. According to Dr. Wright, Howard judged Dr. Wright's application using unclear and inconsistent criteria, and a jury could find that this treatment was arbitrary and capricious.

Finally, Dr. Wright notes that the Provost acknowledged that the Political Science Department should have established specific, written tenure criteria and given them to Dr. Wright as required by the Faculty Handbook. The Chairman of the Political Science Department acknowledged that the department had only infor-

mal standards, rather than official tenure requirements, and he believed that Dr. Wright satisfied the informal standards. According to Dr. Wright, a jury could reasonably find that Howard failed to substantially comply with the Faculty Handbook's requirements and that the tenure-review process was arbitrary and capricious and demonstrated bad faith.

We agree with the trial court that Dr. Wright's factual allegations do not provide adequate support for an implied-covenant claim. Although Dr. Wright did provide evidence of apparent inaccuracies and inconsistencies in the review process, the picture he paints, even viewed in the light most favorable to him, is one of inadvertence and forgetfulness, not bad faith or the degree of unfair conduct necessary to make out his implied-covenant claim. Dr. Wright alleges intentional deceit in only one instance: the Dean's statements about the reasons for the Dean's initial recommendation against tenure and subsequent change of heart. Even assuming that the record sufficed to permit an inference of intentional deceit on that point, evidence that a single faculty member who ultimately recommended in favor of tenure was unwilling to admit the reasons for an earlier contrary recommendation provides scant support for a claim that Howard's ultimate decision to deny tenure to Dr. Wright was made in bad faith or rose to the level of arbitrary and capricious conduct. *Cf. University of Baltimore v. Iz*, 123 Md.App. 135, 716 A.2d 1107, 1128 (Ct. Spec.App.1998) (plaintiff did not state claim for breach of implied covenant where there was "no evidence that the process was merely a sham to ratify an arbitrary decision" to deny tenure).[5]

■ Finally, we note that some of Dr. Wright's arguments, both in the trial court and on appeal, seem to imply that Dr. Wright was entitled to tenure as long as he met the minimum requirements specified by Howard. Dr. Wright points to nothing in the record to support such a view, which appears to reflect a misunderstanding of the tenure process. The question whether a faculty member should be granted tenure at a university depends on context and will necessarily involve subjective, qualitative judgments. *See generally Colburn v. Trustees of Indiana Univ.*, 973 F.2d 581, 590 (7th Cir.1992) (tenure criteria such as teaching, research, and service are inherently subjective); *Faro v. New York Univ.*, 502 F.2d 1229, 1231–32 (2d Cir.1974) ("Of all fields ... [that] the federal courts should hesitate to invade and take over, education and faculty appoint-

5. Dr. Wright contends that the trial court impermissibly decided factual questions in granting summary judgment on the implied-covenant claim. The trial court, however, explicitly acknowledged that it was obliged to view the facts in the light most favorable to Dr. Wright. In any event, for the reasons explained in text, Dr. Wright failed to proffer sufficient evidence to permit a reasonable fact-finder to find a breach of the implied covenant of good faith and fair dealing. Dr. Wright also appears to argue that Howard incorrectly applied the tenure criteria in the Faculty Handbook relating to research, publications, and community service. Evidence that a university failed to substantially comply with its own rules governing tenure decisions can provide support for a claim that the university breached the implied covenant of good faith and fair dealing. *See Allworth*, 890 A.2d at 202. In this case, it is not clear that Dr. Wright's evidence, even when viewed in the light most favorable to Dr. Wright, would establish a failure to comply with the Faculty Handbook's tenure requirements relating to research, publications, and community service. In any event, we agree with the trial court's conclusion that any such non-compliance could not reasonably be viewed as the kind of substantial non-compliance that could support a finding of a breach of the implied covenant of good faith and fair dealing in the present setting.

ments at a University level are probably the least suited for federal court supervision."); *Stern v. University of Oklahoma Bd. of Regents,* 841 P.2d 1168, 1172 (Okla. App.1992) ("Because tenure decisions require subjective judgments regarding candidates' qualifications and because of the long-term commitment a decision of tenure necessarily entails, courts should be wary of intruding into the world of university tenure decisions, absent discrimination or other unlawful action by the university."). It is for these reasons that this court has emphasized the importance of the background principles of academic freedom and university discretion in cases involving claims such as those raised in the present case. *See Allworth,* 890 A.2d at 202; *Brown v. George Washington Univ.,* 802 A.2d 382, 385 (D.C.2002).

The judgment of the trial court is therefore.

*Affirmed.*