Kwangho JUNG, Appellant,

v.

**GEORGE WASHINGTON UNIVERSITY,**
Appellee.

No. 99–CV–1087.

District of Columbia Court of Appeals.

Argued May 3, 2001.

Decided May 26, 2005.

---

John F. Karl, Jr., Washington, with whom Jodi T. Tuer, was on the brief, for appellant.

Alfred F. Belcuore for appellee.

Before WAGNER, Chief Judge, and FARRELL, Associate Judge, and PRYOR, Senior Judge.

WAGNER, Chief Judge:

Appellant, Kwangho Jung, commenced this action against George Washington University (the University) alleging violations of the District of Columbia Human Rights Act (the Act)[1] and breach of a settlement agreement in connection with the University's termination of his candidacy for a Doctor of Philosophy Degree (Ph.D.). The trial court granted judgment as a matter of law on Jung's retaliation claim, and a jury returned a verdict in favor of the University on Jung's claim of discrimination under the Human Rights Act. On appeal, he argues that the trial court erred in granting judgment as a matter of law on the retaliation claim, in making certain evidentiary rulings, and in instructing the jury.[2] We affirm.

---

1. D.C.Code § 1–2525(a) (1999) has been recodified at D.C.Code § 2–1402.61(a) (2001).

2. The trial court (Judge Bowers) granted in part the University's Motion for Summary Judgment prior to trial. Specifically, the

court dismissed Jung's claim that the University had: (1) failed to prepare him properly for the examination, (2) failed to establish fair academic standards for discriminatory reasons and (3) wrongfully terminated his candidacy in violation of the handbook and manual

## I.

### Factual Background

According to the evidence at trial, Jung, who was born in Korea, received his bachelor's degree in Political Science and his master's degree in International Relations from Kyungpook National University in Korea.[3] In the fall of 1991, Jung entered the University's Graduate School of Arts and Sciences and began a course of study leading to a Ph.D.[4] Jung majored in International Relations and minored in Comparative Politics.

Jeffrey Henig, Chair of the Political Science Department at the University, testified that the requirements for Jung to continue to the dissertation portion of the Ph.D. program included successful completion of course work and passing a comprehensive written and oral examination. Henig also testified that a candidate for the degree at the University is given two chances to pass the comprehensive examination, but a second failure results in termination from the program. Jung testified that he was aware of this policy. Jung fulfilled the prerequisites for taking the comprehensive examination, but he received a failing grade on the comprehensive exam in May 1994 and again in November 1994. Therefore, the University terminated him from its Ph.D. program.

Jung filed his first lawsuit against the University in 1995 alleging discrimination on the basis of race and national origin in violation of the District of Columbia Human Rights Act, breach of contract and wrongful termination of candidacy for the Ph.D. degree, breach of covenant of good faith and fair dealing, negligent misrepresentation and promissory estoppel. On December 18, 1995, the parties settled the case, and pursuant to the terms of their Settlement Agreement, Jung was reinstated into the Ph.D. program and allowed to take the comprehensive examination a third time. In September 1996, Jung took the comprehensive examination and again received a failing grade.

For Jung's third comprehensive examination, four University professors served on the evaluation committee: Dr. Maurice A. East, Dr. Martha G. Finnemore, Dr. Henry Nau and Dr. James M. Goldeiger (for the written portion only). Each of them testified at trial. Dr. East testified that there are no written or objective standards for guiding members of the executive committee in evaluating oral or written comprehensive examinations. He testified that based on grades in the classes and performance on oral and written comprehensive examinations, "we have to make an overall judgment, has this person shown the skills and analytic capabilities to write an acceptable dissertation." Dr. East also testified that the evaluation committee "look[s] for a cogent grasp of the field of knowledge, which includes the ability to relate different ideas; ... the ability to analyze in a sophisticated manner; [and] the ability to discriminatingly compare and contrast various ideas and concepts, and to make arguments." In addition, Dr. East testified that the comprehensive examination covers a body of knowledge that is not identical to the courses, and therefore, the degree candidate is given a supplemental reading list

of personnel policies. Jung does not challenge these rulings on appeal.

3. In the undergraduate program, Jung graduated in the top five percent of his graduating class. In the master's degree program, Jung was ranked number one in his class.

4. Before entering the program, Jung took an intensive English course at Georgetown University's School of Language and Linguistics and courses in International Relations also at Georgetown.

and encouraged to work independently and in groups.

Dr. East also testified that the committee individually grades the written portion of the comprehensive examination and assesses the oral portion as a group and makes a judgment about the grade. He said that the grades for the comprehensive exam are pass, bare pass, minimum pass, or fail. Dr. East further testified that because of Jung's failure on the written portion of the examination, he thought it would take a "Herculean effort" by Jung in the oral examination to convince him that Jung was capable of continuing in the Ph.D. program. According to Dr. East, Jung's analysis was weak, and he did not demonstrate an ability to compare and contrast as clearly and cogently as expected. He further testified that Jung "was unable to take the analysis and answer the questions that were asked ... by the members of the committee to our satisfaction."

In testimony, Dr. Finnemore explained that a student receives one grade for the comprehensive examination; that the written and oral portions are assessed together; and that high performance on one part can provide balance where the performance on the other part is weak. According to Dr. Finnemore, Jung's written essays on two of the four questions were incoherent, and he failed to show an understanding of the theories he was required to compare and analyze.

Dr. Goldeiger testified that he gave Jung a failing grade on the written examination because his answers to the first three of four questions were unsatisfactory, although the answer to the fourth was more thoughtful. Dr. Nau testified that Jung showed no ability to apply the relevant theories on the written examination, for which all committee members gave a failing grade. He testified that after the orals there was a clear sense that this was not a passing exam.

## II.

### Exclusion of Expert Testimony

Jung argues that the trial court erred in refusing to allow him to present the testimony of expert witnesses, Dr. Bruce Vaughn and Dr. Sanghyun Yoon. These witnesses, he contends, would have testified that his performance on the examination was sufficient for a passing grade and that his performance on the comprehensive examination was superior to that of two Caucasian–Americans. Jung contends that the trial court's ruling was erroneous because: (1) it violated the law of the case doctrine, and (2) the evidence was otherwise admissible.

### A. Law of the Case Doctrine Argument

 Jung argues that the trial judge erred in making an evidentiary ruling excluding the evidence during trial because the pre-trial judge had made a contrary ruling in denying the University's motion *in limine* seeking to exclude this evidence. "'The law of the case doctrine prevents relitigation of the same issue in the same case by courts of coordinate jurisdiction.'" *Johnson v. Capital City Mortgage Corp.,* 723 A.2d 852, 857 (D.C.1999) (quoting *Johnson v. Fairfax Vill. Condo., IV Unit Owners Ass'n,* 641 A.2d 495, 503 (D.C. 1994)) (other citation omitted). Generally, the doctrine is applicable when: (1) the prior ruling has "sufficient finality"; and (2) the earlier ruling is not clearly erroneous considering any new facts or a change in substantive law. *Id.* (citing *Fairfax Vill.,* 641 A.2d at 503) (quoting *Kritsidimas v. Sheskin,* 411 A.2d 370, 372 (D.C. 1980)).

 The doctrine is not applicable here because the earlier *in limine* ruling was

not of sufficient finality to invoke its application. "[R]ulings on motions *in limine* normally are considered provisional, in the sense that the trial court may revisit its pre[-]trial evidentiary rulings" in the context of the presentation of the evidence in the case. *United States v. Marino*, 200 F.3d 6, 11 (1st Cir.1999) (citation omitted), *cert. denied*, 529 U.S. 1137, 120 S.Ct. 2022, 146 L.Ed.2d 969 (2000). This court has observed that: "[L]ong ago, it was decided that interlocutory rulings do not settle the law of a case and are not conclusive or binding on the trial judge, who has the ultimate responsibility of deciding the case on the merits." *Sowell v. Walker*, 755 A.2d 438, 444 (D.C.2000) (quoting *District of Columbia v. Faison*, 278 A.2d 688, 690 (D.C.1971)) (in turn quoting *McNeill v. Jamison*, 116 A.2d 160, 161 (D.C.1955)). Although this court has not addressed squarely whether a pre-trial evidentiary *in limine* ruling is such an interlocutory ruling, other courts have so held. *See, e.g., Malinovsky v. Court of Common Pleas*, 7 F.3d 1263, 1266 n. 2 (6th Cir.1993) (noting that a motion *in limine* is an interlocutory order under Ohio law); *State v. Cole*, 71 S.W.3d 163, 175 (Mo.2002) (ruling *in limine* is interlocutory, subject to change during trial and requiring attempt to present the evidence to preserve the issue for appeal), *cert. denied*, 537 U.S. 865, 123 S.Ct. 261, 154 L.Ed.2d 108 (2002); *State v. Lamb*, 321 N.C. 633, 365 S.E.2d 600, 608 (N.C.1988) (ruling on motion *in limine* is interlocutory and subject to change "if circumstances develop which make it necessary"). We have observed that an interlocutory ruling, "by hypothesis is not final, and therefore subject to reconsideration prior to the entry of a final judgment." *Williams v. Vel Rey Props., Inc.*, 699 A.2d 416, 419 (D.C.1997) (citation omitted).

The determination of the relevance and admissibility of evidence depends on the context of the issues raised and evidence presented at trial. Therefore, application of law of the case principles to restrict the trial court's discretion to revisit pre-trial evidentiary rulings made without the benefit of relevant considerations appearing after further development of the record would be particularly inappropriate. Under the law of the case doctrine, the trial judge is not bound by earlier final rulings of another judge where new facts arise. *In re Barlow*, 634 A.2d 1246, 1248 n. 3 (D.C.1993) (citing *United States v. Davis*, 330 A.2d 751, 755 (D.C. 1975)). As we have observed:

> [w]hile it is highly desirable that a judge show respect for prior rulings made by another judge in the same case, and should not lightly depart from them, the ultimate responsibility rests on the judge to whom the case is assigned for trial on the merits. If the trial judge is strongly convinced ... that a preliminary or interlocutory ruling made by another judge was clearly erroneous, the trial judge is not bound to follow that ruling.

*Id.* (quoting *Davis*, 330 A.2d at 755 (in turn quoting *Faison, supra*, 278 A.2d at 690)). Application of the foregoing principles support the trial court's decision to revisit the issue of the qualifications of the experts to render an opinion on specific issues in the context of the trial.

In this case, the motions judge denied, without a requested hearing, the University's motion to exclude the testimony of Jung's experts, Dr. Bruce Vaughn and Dr. Sanghyun Yoon. Although the motions judge had available the depositions of the proffered experts at the time of its ruling, the University argued before the trial court that it had additional information and should have an opportunity to conduct a *voir dire* of the experts during the trial. Dr. Vaughn indicated that his resume re-

quired updating, although Jung's counsel suggested that the update was not significant. Jung's counsel conceded that she intended to have the witnesses testify about their expert qualifications in order for the jury to understand the basis for the opinions and to assess their credibility. The trial court was persuaded that it should not be foreclosed from considering this evidentiary presentation and determining whether the expert was in fact qualified to render opinions in the areas proffered in light of the issues raised at trial and its function as the gatekeeper for expert testimony. We agree.

 The prior *in limine* ruling was an interlocutory one, and therefore, appropriate for reconsideration in the context of the trial. *See Williams, supra,* 699 A.2d at 419. The earlier ruling on the qualifications of the witnesses to render opinions on the issues as they developed at trial was not sufficiently final for application of the law of the case doctrine. *See Kritsidimas, supra,* 411 A.2d at 372 (citation omitted) (the law of the case doctrine does not apply where the prior ruling has little finality); *see also Malinovsky, supra,* 7 F.3d at 1266 n. 2. Moreover, under the law of the case doctrine, a trial court is not required to adhere to an earlier ruling if new facts indicate that the prior ruling was clearly erroneous. *Barlow, supra,* 634 A.2d at 1248 n. 3. While the qualifications of the experts might have remained the same or substantially so, the matters on which they would be asked to render an opinion would be related to the evidence presented at trial. The trial court properly determined that it was bound to consider the issue anew in light of the evidence presented at trial. Generally, a trial court is in a better position than the motions court to determine whether an expert has sufficient qualifications to render an opinion that will probably aid the jury in resolving the questions of fact actually raised at trial. Here, after hearing the witnesses' qualifications in the context of the trial, the trial court permitted the witnesses to offer opinions with respect to certain issues, while precluding them from doing so with respect to others. Under the circumstances, we find no error in the trial court's decision to revisit the issue addressed pretrial during the trial. *See Faison, supra,* 278 A.2d at 690.

**B.** *Admissibility of the Expert Opinions*

**1.** *Applicable Legal Principles*

 Jung argues that the trial court erred on the merits in its determination to exclude the testimony of expert witnesses, Dr. Bruce Vaughn and Dr. Sanghyun Yoon. He contends that both of these witnesses are qualified to testify in the areas for which proffered. The trial court precluded presentation of their opinions on whether Jung met the University's standards for passing the requirements for remaining in the Ph.D. program and whether his performance on the examination was equal to or better than that of the two other students. The trial court determined that Dr. Vaughn did not have the requisite familiarity with the University's standards to render the opinions sought and that familiarity with standards of other universities for evaluating a Ph.D. candidate's examination does not establish a basis for subjectively evaluating the student applying George Washington University's standards. The court also based its ruling for both witnesses on the extremely subjective nature of such an academic judgment and evaluation.

 The trial court has broad discretion in determining whether to admit expert testimony, and its ruling admitting or excluding such evidence will not be disturbed unless " 'manifestly erroneous.' " *Green v. United States,* 718 A.2d 1042,

1050 (D.C.1998), *cert. denied,* 526 U.S. 1011, 119 S.Ct. 1156, 143 L.Ed.2d 222 (1999) (quoting *Dyas v. United States,* 376 A.2d 827, 831 (D.C.), *cert. denied,* 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977)) (in turn quoting *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962)) (other citations omitted). The well established criteria for admitting expert testimony requires that:

> (1) the subject matter "... be so distinctively related to some science, profession, business or occupation *as to be beyond the ken of the average layman;*" (2) the witness ... have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference *will probably aid the trier in his search for truth;* and (3) ... "the state of the pertinent art or scientific knowledge ... permits a reasonable opinion to be asserted ... by an expert."

*Id.* (quoting *Dyas,* 376 A.2d at 832) (quoting McCORMICK ON EVIDENCE § 13, at 29–31 (E. Cleary ed., 2d ed.1972)) (emphasis in original).

The trial court determined that Dr. Vaughn did not have sufficient knowledge and experience to testify on whether Jung met the University's standards for performance on the comprehensive examination or whether his performance on the examination was equal or superior to that of the two other students. The court concluded that Dr. Vaughn did not have the requisite knowledge and experience with examinations at the doctoral level or with this particular University's standards. The court was also persuaded that the evaluative judgment concerning academic performance is a subjective matter to which the court must give deference. The

court did permit Dr. Vaughn, who had tutored Jung, to testify on Jung's ability to think critically and analytically, but precluded him from linking his observations to the University's standards or testifying that he should have passed the University's examination. With respect to Dr. Vaughn, the trial court's ruling on qualifications is supported by the record.

 "Whether a witness possesses the requisite qualifications to express an opinion on a particular subject is within the trial court's discretion, and its decision in that regard will only be reversed for an abuse." *Otis Elevator v. Tuerr,* 616 A.2d 1254, 1256 (D.C.1992) (citing *Dyas, supra,* 376 A.2d at 832; *Waggaman v. Forstmann,* 217 A.2d 310, 311 (D.C.1966)). To qualify as an expert witness and to be permitted to render an opinion, " 'the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.' " *Dyas,* 376 A.2d at 832 (quoting McCORMICK ON EVIDENCE § 13 at 29–31).

### 2. *Dr. Vaughn's Proffered Testimony*

Under the foregoing standard, the trial court's ruling did not exceed the bounds of its discretion in precluding Dr. Vaughn from rendering an opinion on whether Jung met this particular university's standards for passing the comprehensive examination or compared favorably with other students in the program. Although Dr. Vaughn has a Ph.D. degree in Political Science and had teaching experiences at the university level, he admitted that he had never given an examination at the doctoral level or formulated questions for such an examination.[5] The courses he

---

**5.** Dr. Vaughn has a Ph.D. degree from the Australian National University in Political Science with a specialty in Asian Pacific Comparative Politics. He earned his master's de-

taught in International Theory were only at the undergraduate level. He stated that in Australia, in a collaborative system for undergraduates and master's degree candidates, the ultimate responsibility for grading rested with the senior person on the team, and he had never been the senior person. Dr. Vaughn agreed that the grading system at the undergraduate and master's level is different than that for a doctoral program. He testified that he had never taught Ph.D. students nor taken a written comprehensive examination at the doctoral level.[6] Further, his postgraduate educational and teaching experiences were in Canada and Australia, and he admitted that not all universities have the same standards. Dr. Vaughn had no experience with the standards for the University involved in this case. While Dr. Vaughn had written many articles for publication, he had never published any in the field of International Relations, Jung's area of study, as it relates to theory. In spite of Dr. Vaughn's impressive credentials, consideration of the factors outlined for admissibility support the trial court's ruling rejecting Dr. Vaughn's qualifications as an expert witness in the areas for which he was proffered (*i.e.*, standard and qualifications for passage of Ph.D. level examinations and the superiority of Jung's examination to that of two other students). Therefore, we find no abuse of discretion in the trial court's ruling with respect to Dr. Vaughn. *See Otis Elevator, supra,* 616 A.2d at 1256.

### 3. *Dr. Yoon's Proffered Testimony*

Jung argues that Dr. Yoon had the requisite knowledge and experience related to the University to permit his expert testimony. Dr. Yoon testified that he had received his Ph.D. degree from George Washington University in Political Science with a specialty in International Relations. He wrote his dissertation in International Relations of East Asia, specifically the Sino-South Korea relationship, and parts of it were published in major journals in the United States. As a requirement for the degree, he sat for the comprehensive oral and written examination in his field of study, International Politics. He has a Master's degree from Georgetown University, where he took an oral comprehensive examination which he passed with distinction.[7] In the spring of 1996 and fall of 1997, he was an adjunct professor at George Washington University, where he worked in the Political Science Department, which was chaired by Jeffrey Henig, and the Elliott School. Dr. Young Kim, who had been on his dissertation committee, invited him to be a guest lecturer at the University. In 1998, he was a member of the dissertation committee at the University in the Department of Public Policy, within the Political Science Department, where he evaluated Ph.D. candidates. Dr. Yoon testified that he had had many conversations with professors at the University. He testified that in four to five years of teaching, he had taught Political Science

---

gree from the Norman Patterson School of International Affairs from Carlton University in Ottawa, Canada, which he testified "is integrated closely in the North American system." For both degrees, he had an oral examination. In responding to the question concerning how he would compare the panel that he had for the examination at the Australian National University with a panel at a university in America, Dr. Vaughn testified that "[m]y understanding is that it's similar, but somewhat

different." He explained that the similarity is that a panel of experts in the field "grill" you to determine whether you are qualified.

**6.** Dr. Vaughn testified that his examinations for his master's and Ph.D. degrees were oral.

**7.** Dr. Yoon received his undergraduate degree from Seoul National University where he majored in Economics and minored in International Relations.

to more than 300 students and evaluated more than 500 student papers.

The trial court permitted Dr. Yoon to testify about the standards for passing a comprehensive examination at the Ph.D. level in International Relations. He testified that it required a mastery of the literature in the field, critical thinking about the topic, a broad understanding of international politics and the application of theories to the real world, and the ability to respond to the examination questions. He stated that the standard was a universal one and that the University's standard was no different. He testified that the candidate had to show that he could make a contribution to the field through his dissertation. He said that members of the Political Science Department had reached a consensus with him in making the evaluation of Ph.D. candidates. Dr. Yoon testified that he was familiar with Jung's work and had read his papers for ideas and insights when he was preparing for his comprehensive examination in International Politics Theory.

Dr. Yoon stated that the Ph.D. students only audited his course, but that there was no difference between courses for credit, as long as the course was offered at the graduate level. Dr. Yoon admitted that he had never given, put together or graded Ph.D. comprehensive examinations. He agreed that the standards for evaluating students at the Master's level and Ph.D. level are different. However, he said that the courses he taught are offered for both levels. He stated that he took his comprehensive examination for his major field in International Politics in 1993.

Jung offered Dr. Yoon as an expert to render an opinion as to the standards for passing the comprehensive examination at the Ph.D. level in International Relations at the University and to testify that Jung's 1996 comprehensive examination was bet-

ter than that of two other students who wrote that same year. The trial court accepted the witness as an expert with respect to the standards for passing the comprehensive examination at the Ph.D. level, but rejected him as an expert to testify about the relative merit of Jung's examination when compared with the two other students. The trial court explained that its reasons were the same as for the prior witness, Dr. Vaughn. Jung argues that the trial court erred in its ruling. He contends that Dr. Yoon possessed the qualifications that the trial court found lacking in Dr. Vaughn. He argues that since the University considered him qualified to sit on the dissertation committee, it follows that he was qualified to sit on the lower level comprehensive examination committee. Further, he contends that the trial court erred in giving excessive deference to claimed academic judgments.

Again, we review the trial court's decision to exclude expert testimony for an abuse of discretion. *Johnson v. District of Columbia*, 728 A.2d 70, 74 (D.C.1999) (citing *Morgan v. Psychiatric Inst. of Wash.*, 692 A.2d 417, 423 (D.C.1997)) (other citations omitted). As to qualifications, Dr. Yoon admitted that he had never given a Ph.D. comprehensive examination, put together questions for it or graded it. The Ph.D. students who attended his course only audited it, and he did not have to administer an examination for them. While the court found him competent to render opinions about the University's standards, given the evidence of his lack of experience with the type of examination at issue in this case, the trial court could reasonably exercise its discretion to preclude him from rendering his opinion about whether Jung should have passed the examination under those standards.

#### 4. *Academic Deference*

 Moreover, the court's exercise of discretion must be viewed in light of the

ultimate decision that was being made in Jung's case. "This court has recognized that a judgment by school officials that a student has not performed adequately to meet the school's academic standards is a determination that usually calls for judicial deference." *Alden v. Georgetown Univ.*, 734 A.2d 1103, 1108 (D.C.1999) (citing *Kraft v. William Alanson White Psychiatric Found.*, 498 A.2d 1145, 1149 (D.C. 1985)) (in turn citing *Board of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 89–90, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978)). Courts should show great respect for such professional judgments and not overturn an academic decision " 'unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.' " *Alden*, 734 A.2d at 1109 (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985)) (citing *Youngberg v. Romeo*, 457 U.S. 307, 323, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). "Only the most compelling evidence of arbitrary or capricious conduct would warrant interference with the performance evaluation (grades) of a ... student made by his teachers." *Greenhill v. Bailey*, 519 F.2d 5, 10 n. 12 (8th Cir.1975).

 In this case, the trial court had sound reasons for according deference to the academic decision and rejecting the introduction of expert opinion offered in an effort to establish that Jung should have passed the examination. Neither proffered expert participated in the examination. Indeed, neither had prepared or graded comprehensive oral or written examinations at the Ph.D. level. Since a portion of the examination was oral, neither had any way of knowing how Jung performed on it. While certain standards of performance were outlined by Dr. Yoon, there remains the element of subjectivity involved in grading this type of examination. In that process, there might be room for a difference of opinion even among colleagues. Thus, such decisions are " 'not readily adapted to the procedural tools of judicial or administrative decision making.' " *Alden, supra*, 734 A.2d at 1109 (quoting *Horowitz, supra*, 435 U.S. at 90, 98 S.Ct. 948). Public policy considerations undergird the deference accorded the academic institution in grading its students. *Id.* Public confidence in the qualifications of graduates of a particular school requires that " 'the decisions surrounding the issuance of these credentials be left to the sound judgment of the professional educators who monitor the progress of their students on a regular basis.' " *Id.* (quoting *Olsson v. Board of Higher Educ.*, 49 N.Y.2d 408, 426 N.Y.S.2d 248, 402 N.E.2d 1150, 1153 (1980)). In light of these factors and the qualification evidence before the court, we can not say that the trial court abused its discretion in precluding expert testimony on whether Jung should have passed the examination.

 Jung argues that even if "judicial reluctance to intervene" is appropriate for Jung's contract claims, such reluctance is inappropriate for his claims under the Human Rights Act. He contends that such an interpretation would be contrary to the Act and would create a double standard for the benefit of the University where there is a factual dispute regarding a student's academic performance. We disagree. There is nothing in the statute that suggests that academic deference is precluded from consideration in a case under the Human Rights Act. Nor is academic deference inconsistent with the policies underlying the Act. Consistent with considering whether the circumstances surrounding the determination of a student's grade evinced a racial motivation or other discriminatory animus, in whole or in part,

the fact finder could also be instructed, in an appropriate case, that academic deference can be accorded the school's grade given.[8] If it were determined that an unlawful discriminatory animus motivated the action, the plaintiff would be entitled to prevail despite any academic deference accorded. Therefore, we reject Jung's argument that academic deference has no place in a case under the Act.

## C. *Exclusion of Comparative Evidence*

■ Jung argues that the trial court erred in not allowing another student's written essay examination to be admitted into evidence. He contends that the jury should have been able to compare a white male student's (John Doe) written essay exam, which was taken in February 1996 and received a "bare pass" grade, to his written essay exam, which was taken in September 1996. He contends that such evidence would have allowed the jury to conclude that his examination was superior to the other student's, and therefore, his failing grade must have been the result of unlawful discrimination.

■ "The evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision." *Knight v. Georgetown Univ.*, 725 A.2d 472, 477–78 (D.C.1999) (quoting (*William A.*) *Johnson v. United States*, 683 A.2d 1087, 1095 (D.C.1996) (en banc), *cert. denied*, 520 U.S. 1148, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997) (other citation omitted)). Evidentiary rulings on relevancy will be overturned only upon a showing of grave abuse. *Knight*, 725 A.2d at 478 (citing *Roundtree v. United States*, 581 A.2d 315, 328 (D.C.1990)).

We find no abuse of discretion in the trial court's ruling. The lay jury was not in a position to analyze and compare the two examinations. Again, this is an area for academic deference. Moreover, John Doe's performance on an examination given in one semester cannot be fairly analyzed against Jung's performance on the examination in another semester. Further, since the University's grading system includes evaluation of the student's written and oral performances, a comparison of John Doe's written examination would not be sufficient to compare the performances of the two candidates for the degree.

## III.

### *Requested Direct Evidence/Burden of Proof Instruction*

Jung argues that the trial court erred in declining to give requested jury instructions to the following effect: (1) presentation of direct evidence of discrimination shifts the burden of proof to the University to prove that he would have received a failing grade for the compre-

8. Jung seems to argue that this court's decision in *Gay Rights Coalition v. Georgetown Univ.*, 536 A.2d 1 (D.C.1987) (en banc), forecloses academic deference. Unlike the present case, that case did not involve the grading of students. In *Gay Rights Coalition*, this court held, *inter alia*, that it was a violation of the Human Rights Act for Georgetown to deny tangible benefits to the plaintiffs on the basis of sexual orientation and rejected that the University's free exercise defense exempted it from compliance with the statute because of the District's compelling interest.

*Id.* at 39. This court stated that "[t]he Human Rights Act cannot depend for its enforcement on a regulated actor's purely subjective, albeit sincere, evaluation of its own motivations." *Id.* at 26. This principle is not inconsistent with, nor does it preclude academic deference in an appropriate case. It would mean in the academic context that the institution's subjective explanations of an innocent motivation should not be accepted automatically; its decision may still be scrutinized for evidence of an improper animus.

hensive examination notwithstanding the views of Dr. East; and (2) the jury could find for him on the discrimination claims if they disbelieved the University's reasons for the failing grade. The University argues in response that the trial court properly instructed the jury on burden of proof and other controlling legal principles in the context of this case. We consider each of these arguments in turn.

Jung points to evidence that Dr. East, one of the committee members who graded his last examination, harbored views to the effect that Korean students tended to engage in rote learning and to state the material verbatim on examination without analysis or responsiveness to the question. Dr. East admitted that, at some unspecified times, he had expressed such views to Professors Finnemore, Goldeiger, and Nau (all of whom were on the committee grading Jung's comprehensive examinations) and to Professors Sell and Lebovic. Jung argues that this constitutes direct evidence of a discriminatory animus, which if credited by the jury, proved that unlawful discrimination was at least a motivating factor in the University's actions. Therefore, he argues, the trial court erred in declining to give an instruction that the burden of proof shifted to the University to prove that he would have received a failing grade on the comprehensive examination anyway, i.e., regardless of the views of Dr. East. The University argues that Jung failed to meet his burden to show that this was a direct evidence case and that, in any event, the court's instructions adequately covered the applicable law on burden of proof and pretext.

### A. Applicable Legal Principles

 "Generally a party is entitled to a jury instruction upon the theory of the case if there is sufficient evidence to support it." *George Washington Univ. v. Waas*, 648 A.2d 178, 183 (D.C.1994) (citing *Wingfield v. Peoples Drug Store, Inc.*, 379 A.2d 685, 688 (D.C.1977)) (other citations omitted). The trial court has broad discretion in formulating jury instructions, " 'and its refusal to grant a request for a particular instruction is not a ground for reversal if the court's charge, considered as a whole, fairly and accurately states the applicable law.' " *Id.* (quoting *Psychiatric Inst. of Wash. v. Allen*, 509 A.2d 619, 625 (D.C.1986)) (other citation omitted). Even if the court presents the instruction in a more general way, so long as it fully informs the jury on the law, the refusal to give the requested instruction does not warrant reversal. *Mark Keshishian & Sons, Inc. v. Washington Square, Inc.*, 414 A.2d 834, 841 (D.C.1980) (citing *Wingfield*, 379 A.2d at 689) (other citation omitted).

 The D.C. Human Rights Act provides that it shall be an unlawful discriminatory practice for an educational institution:

(1) To deny, restrict, or to abridge or condition the use of, or access to, any of its facilities and services to any person otherwise qualified, wholly or partially, for a discriminatory reason, based upon the race, color, ... [or] national origin ... of any individual.

D.C.Code § 1–2520 (1999).[9] Although a claim of discrimination under the Human Rights Act is generally considered under the three-part burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),[10] that test is deemed

---

**9.** Recodified at D.C.Code § 2–1402.41 (2001).

**10.** Under the *McDonnell Douglas* burden-shifting test, the employee has the initial bur-den of making a *prima facie* showing of discrimination, which, if made, raises a rebuttable presumption that the employer's conduct amounted to unlawful discrimination. *Hol-*

inappropriate when a plaintiff offers direct evidence of discrimination. *Hollins, supra* note 9, 760 A.2d at 574. Where a plaintiff offers direct evidence of discrimination, the court uses a "mixed motives" test, outlined in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), which requires the plaintiff to show that discrimination "was a motivating factor for any employment practice, even though other factors also motivated the practice." *Hollins,* 760 A.2d at 575 (citation omitted). Under *Price Waterhouse,* upon presentation of direct evidence of discrimination, the burden of persuasion shifts to the employer to demonstrate by a preponderance of the evidence that it would have made the same decision absent the impermissible motive. 490 U.S. at 252–53, 258, 109 S.Ct. 1775.[11]

 To warrant treatment under *Price Waterhouse,* a plaintiff claiming direct evidence of discrimination has a heavy burden, for not every comment reflecting discriminatory attitudes will support an inference that it was a factor motivating the adverse decision. *Hollins, supra,* 760 A.2d at 575. Stray remarks in the workplace and statements by decision makers that are unrelated to the decision making process are not considered sufficient to satisfy the direct evidence burden. *Id.* (citing *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775) (O'Connor, J., concurring). Such statements may be too attenuated because not directed at the plaintiff. *Id.* (citation omitted). Therefore, "the plaintiff 'must present evidence of conduct or statements by persons involved in the decision making process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the factfinder to infer that *that* [*the* ] *attitude was more likely than not a motivating factor in* [*the alleged adverse action* ].' " *Id.* (citations omitted) (emphasis in original).

## B. *Analysis*

 Dr. East's generalized comments about Korean students are of the type suggesting a biased attitude based on the students' ethnicity or national origin. *See e.g., Price Waterhouse, supra,* 490 U.S. at 236, 109 S.Ct. 1775 (Partner's repeated comments to the effect that women could not be considered as partnership candidates or were not capable of functioning as senior managers are direct evidence of discrimination.); *Haynes v. W.C. Caye & Co., Inc.,* 52 F.3d 928, 930 (11th Cir.1995) (Statements that women are not tough enough to do the job or that it would require a man to do the job are classic examples of direct evidence of discrimination.). Similar to the comments made in *Price Waterhouse* and *Haynes,* which showed a gender-based assessment of the plaintiffs' capabilities, it is fair to say that

lins v. Federal Nat'l Mortgage Ass'n,* 760 A.2d 563, 571 (D.C.2000). "Once the presumption is raised, the burden shifts to the employer to rebut it by articulating 'some legitimate, nondiscriminatory reason for the employment action.' " *Id.* (quoting *Atlantic Richfield Co. v. District of Columbia Comm'n on Human Rights,* 515 A.2d 1095, 1099 (D.C.1986)) (other citation omitted). The employer can meet that burden with evidence from which it can be concluded rationally that the adverse action was not motivated by the discriminatory animus. *Id.* (citing *Atlantic Richfield,* 515 A.2d at 1099–1100). It has been held that

"the *McDonnell Douglas* test 'is to be applied in cases where the circumstantial evidence is the only proof of discrimination.' " *Id.* at 574 (quoting *Equal Employment Opportunity Comm'n v. Alton Packaging Corp.,* 901 F.2d 920, 923 (11th Cir.1990)).

11. Justice O'Connor agreed with Justice Brennan's plurality opinion to make a majority on this particular point. *See Price Waterhouse,* 490 U.S. at 237, 244–45, 261, 109 S.Ct. 1775.

Dr. East's comments here reflect a generalized assessment of the analytical abilities of Korean students based upon nationality.

■ However, such a showing does not end our inquiry into whether there is direct evidence of discrimination. Simply making such a statement in the workplace is not enough; there must be a causal link between the statements and the conduct about which the complaint is made. *Hollins, supra* note 9, 760 A.2d at 575. " 'Absent a causal link between the references and the conduct complained of, such epithets become stray remarks that cannot support a discrimination verdict.' " *Id.* (quoting *Boyd v. State Farm Ins. Co.*, 158 F.3d 326, 330 (5th Cir.1998)) (other citation omitted). In this case, there must be some evidence of a link between Dr. East's statements and the decisional process leading to Jung's failure of the last comprehensive examination that he took. However, missing from this record is any evidence showing that the statements were made at or near the time of the examination and the adverse results or that they were made in connection with the decisional process. Although Dr. East was one of the decision makers, there was no showing that his statements were temporally related or otherwise connected to the decisional process. More particularly, there is no evidence that his sentiments influenced or were shared by any of the three other members of the evaluation committee, all of whom gave Jung a failing grade. Discriminatory remarks which are unrelated to the decisional process, even when uttered by a decision maker, are insufficient to support a claim of discrimination. *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1266 (7th Cir.1993) (citing *Smith v. Firestone*

*Tire & Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir.1989)); [12] *see also Smith v. Leggett Wire Co.*, 220 F.3d 752, 760 (6th Cir.2000) (noting that stray racial comments long before termination too tenuous to be relevant to show racial motive for the employees' termination). In this case, since there was no evidence showing a temporal nexus or a causal link between the statements and the grading of Jung's examination, Jung failed to meet his burden of establishing direct evidence of discrimination sufficient to support the requested direct evidence/burden-shifting instruction. *See Hollins, supra,* 760 A.2d at 574–75. Therefore, we find no error in this regard.

### IV.

#### Retaliation Claim

■ Jung argues that the trial court erred in granting the University's motion for judgment as a matter of law on his retaliation claim under the Human Rights Act. Specifically, he contends that he established a *prima facie* case of retaliation on the theory that he engaged in "protected activity" because he filed the first discrimination law suit against the University, and thereafter, the members of the evaluation committee gave him a failing grade as a result. The University argues that the trial court properly dismissed the claim because it was not shown that the decision makers on the third examination had any knowledge of Jung's prior claim, and even if they did, there was no basis to conclude that such knowledge bore a causal relationship to Jung's grade.

■ The rules of Superior Court provide in pertinent part that "[i]f during a trial by jury a party has been fully heard

12. *Cf. Browning v. President Riverboat Casino–Missouri, Inc.*, 139 F.3d 631, 635 (8th Cir.1998) (use of a racial slur *related to the employment termination decision* by the su-

pervisor/decision maker "directly suggests the existence of bias[, and] no inference is necessary").

with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the Court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party ...." Super. Ct. Civ. R. 50(a)(1). When a motion for judgment is made for directed verdict, the evidence must be viewed in the light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences from the evidence. *Washington Metro. Transit Auth. v. Jeanty,* 718 A.2d 172, 174 (D.C.1998) (citation omitted); *Clement v. Peoples Drug Store, Inc.,* 634 A.2d 425, 427 (D.C.1993) (citing *Bauman v. Sragow,* 308 A.2d 243, 244 (D.C.1973)). "A verdict may be directed only if it is clear that the plaintiff has not established a prima facie case." *Id.* (citing *Marshall v. District of Columbia,* 391 A.2d 1374, 1379 (D.C.1978)). On appeal, we review *de novo* whether the evidence was sufficient to go to the jury.

█ To establish a *prima facie* claim of retaliation under the Human Rights Act, a party must provide evidence that: " '(1) [he] was engaged in a protected activity, or that [he] opposed practices made unlawful by [the Act]; (2) the [University] took an adverse ... action against [him]; and (3) a causal connection existed between the two.' " *Millstein v. Henske,* 722 A.2d 850, 853 (D.C.1999) (quoting *Howard Univ. v. Green,* 652 A.2d 41, 45 (D.C.1994) (footnote omitted)); *Paul v. Howard Univ.,* 754 A.2d 297, 312 (D.C.2000). In dismissing the retaliation claim, the trial court concluded that there was uncontradicted testimony that the people administering and grading the examination had no knowledge of the prior lawsuit or that Jung even had a lawyer at the time they graded Jung's examination. Further, the court observed that Dr. East, Dr. Finnemore and Dr.

Goldeiger had been on leave at the earlier time, thereby "distancing them from the communication stream at the graduate school ... that would have created the potential for them to know about the lawsuit, the discrimination claims that were noted in either the lawsuit or any memo to Dean Sterling from ... Professor Henig." Thus, its ruling was based upon a lack of evidence of the third element of the retaliation claim, *i.e.,* a causal connection between protected activity and the adverse action. *Millstein,* 722 A.2d at 853.

Our review of the record leads us to conclude that the trial court accurately determined that there was no evidence supporting the third element of appellant's retaliation claim. There was no evidence that the decision of the University's examination team to give Jung a failing grade was in retaliation for any protected activity in which Jung engaged. In support of his argument that sufficient evidence was presented, Jung asserts that Dr. East was aware that there was a special problem with Jung because he was taking the examination for a third time. He refers to testimony of Henig in which he stated that he mentioned to Dr. East, that the student was taking the examination for a third time and "it's important to have someone who wasn't involved before," in an effort to get Dr. East, who was on sabbatical and had been in an administrative position, on the team. There is nothing in this statement from which it can be inferred reasonably that Dr. East knew that Jung had filed a discrimination lawsuit against anyone, had secured counsel to vindicate his rights or had otherwise engaged in protected activity. Thus, there is no basis to conclude that Dr. East or any other member of the examination team gave him a lower grade because of protected activity. This is fatal to Jung's retaliation claim. *See Howard Univ. v. Green, supra,* 652 A.2d at 46 ("[e]mployer awareness that the

employee is engaged in protected activity is thus essential to making out a *prima facie* case for retaliation") (citation omitted). Appellant also relies on his testimony that he had complained to Professor Henig about Dr. Nau leaving the examination room during an earlier examination. However, that the professor left the room during the examination does not show a causal nexus between Jung's failing grade and the protected activity in which he engaged. Therefore, we find no error in the trial court's ruling dismissing the retaliation claim.

■■■ Jung also argues that the trial court erred in not giving his request instruction "to the effect that the jury could find in favor of Mr. Jung on the discrimination claims if they disbelieved the reasons given by GW for awarding Mr. Jung a failing grade." He contends that the trial court erroneously held that the instruction requested was not supported by the law, when it was based on the Supreme Court's decision in *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). In *St. Mary's*, the Supreme Court stated:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection "[n]o additional proof of discrimination is *required* [.]"

*Id.* (emphasis in original; footnote and citations omitted). However, the Supreme Court rejected the notion that disbelief of the defendant's proffered reasons *compels* judgment for the plaintiff, because a per-missible inference does not shift the burden of proof; the ultimate burden of persuasion remains with the plaintiff in a Title VII case. The Court adhered to its earlier pronouncements that "(1) the plaintiff must show '*both* that the reason was false, *and* that discrimination was the real reason,' ... and (2) it is not enough ... to *dis*believe the employer.... Even though ... rejection of the defendant's proffered reasons is enough at law to *sustain* a finding of discrimination, *there must be a finding of discrimination*." *Id.* at n. 4 (citations omitted) (emphasis in original). Considering the foregoing exposition, Jung's requested instruction did not go far enough. We have examined the instruction given by the trial court and find that it correctly stated the law. Therefore, we find no error in the trial court's rejection of the proffered instruction.

### V.

■■■ Jung argues that the trial court erred in excluding evidence concerning events that occurred prior to the settlement of his first lawsuit. This evidence consisted of how the 1994 oral examination was conducted, including that some of the professors were not present for the entire examination, and whether it was customary for professors to leave the room during oral examination. "[T]he evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great deal of deference to its decision." *Foreman v. United States*, 792 A.2d 1043, 1056 (D.C.2002) (citations omitted). Since the evidence related to an examination taken before the parties settled the prior claim based on the earlier examinations, the trial court could conclude properly, in the exercise of its discretion, that the evidence was of little relevance to his present discrimination claim.

We find no abuse of discretion in the trial court's ruling warranting reversal.

## VI.

 Jung argues that the trial court erred in dismissing his punitive damages claim. Since Jung did not prove his claim that the University committed an unlawful discriminatory act, the trial court did not err in dismissing his punitive damages claim. *See United Mine Workers v. Moore,* 717 A.2d 332, 341 (D.C.1998) (to recover punitive damages, a plaintiff must prove that the defendant committed a tor-tious act) (citing *Jonathan Woodner Co. v. Breeden,* 665 A.2d 929, 938 (D.C.1995), *cert. denied,* 519 U.S. 1148, 117 S.Ct. 1080, 137 L.Ed.2d 215 (1997)).

For the foregoing reasons, the judgment of the trial court is

*Affirmed.*